# [J-6-2015]
## IN THE SUPREME COURT OF PENNSYLVANIA
### EASTERN DISTRICT

### SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.

| | |
|---|---|
| RONALD GREEN AS THE EXECUTOR OF THE ESTATE OF JOSEPH FUSCO,<br><br>Appellant<br><br><br>v.<br><br><br>PENNSYLVANIA HOSPITAL AND CONTRIBUTORS TO PENNSYLVANIA HOSPITAL AND STELLA BARBER, RN AND SYLVIA AQUINO, RN AND LORI YAKISH, RN AND KELLY A. CARR, RRT AND JAMES KEARNEY, MD AND STEVEN A. GLASSER, MD AND JOHN D. SPRANDIO, JR., MD AND BORA LIM, MD AND EUGENE M. LUGANO, MD AND ANTHONY GIORGIO<br><br>Appellees | : No. 36 EAP 2014<br>:<br>: Appeal from the Judgment of the Superior<br>: Court entered on January 30, 2014 at No.<br>: 2858 EDA 2012, affirming the Order of the<br>: Court of Common Pleas of Philadelphia<br>: County, Civil Division, entered on August<br>: 21, 2012 at No. 4093 June Term, 2009<br>:<br>: ARGUED:  March 10, 2015<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## <u>OPINION</u>

**MADAME JUSTICE TODD**                    **DECIDED:  September 3, 2015**

In this negligence action, Ronald Green, Executor of the Estate of Joseph Fusco (hereinafter "Appellant"), appeals the order of the Superior Court affirming the trial court's grant of a nonsuit in favor of Appellees Pennsylvania Hospital (the "Hospital"), Contributors to Pennsylvania Hospital, Stella Barber, R.N., Sylvia Aquino, R.N., Lori Yakish (formerly Lori Rhoades), R.N., Kelly A. Carr, R.R.T., James Kearney, M.D., Steven A. Glasser, M.D., John D. Sprandio, Jr., M.D., Bora Lim, M.D., Eugene M.

Lugano, M.D., and Anthony Giorgio. For the reasons that follow, we reverse and remand for further proceedings.

## I. Factual and Procedural Background

On December 30, 2008, Joseph Fusco (hereinafter "Decedent") arrived at the emergency department of the Hospital, complaining of shortness of breath, rapid breathing, and wheezing. He was admitted to the Intensive Care Unit ("ICU") and given medication, which failed to alleviate his symptoms. As a result, Decedent, who suffered from a number of pre-existing conditions, including chronic obstructive pulmonary disease, was intubated and placed on a ventilator in order to assist with his breathing. Decedent remained on a ventilator in critical condition for ten days.

On January 9, 2009, in an attempt to wean Decedent from the ventilator, a physician at the Hospital performed a tracheotomy, a surgical procedure in which an opening is made through the neck into the trachea,[1] and a tube is inserted through the opening in order to provide an airway. Because Decedent was going to be placed back on a ventilator after the tracheotomy, a tracheotomy cuff, which is an inflatable device that secures the tracheotomy tube to the sides of a patient's trachea, was placed around the tube and inflated.

On January 10, 2009, Decedent was seen by his pulmonary physician, Dr. Eugene Lugano, who documented a plan to wean Decedent off the ventilator and use a "trach collar," which would allow Decedent to receive oxygen through an aerosol mask instead of a mechanical ventilator. The plan was implemented that day at approximately 12:30 p.m., at which time the tracheotomy cuff was deflated. At approximately 4:30 p.m. that afternoon, Nurse Lori Yakish noticed a moderate to large

---

[1] The trachea is also referred to as the windpipe.

amount of blood coming from the site of Decedent's tracheotomy[2] and reported this to the attending physician, Dr. John Sprandio. Dr. Sprandio advised Nurse Yakish to monitor the situation. Approximately one-half hour later, Nurse Yakish rolled Decedent over so she could clean his back, at which time a large amount of fresh blood began to squirt from the tracheotomy site.

A team of medical personnel, including anesthesiologist Dr. Stephen Glasser, immediately responded to Decedent's room, and determined that Decedent's tracheotomy tube had become blocked, depriving Decedent of an airway. Dr. Glasser testified that, when he arrived, other medical professionals were attending to Decedent's tracheotomy site, and Decedent appeared stable. At approximately 5:00 p.m., Dr. Nora Malaisrie, an ear, nose, and throat ("ENT") physician, arrived in Decedent's room. At this time, Dr. Glasser received another page, requiring him to leave the room, but he asked two of the nurse anesthesiologists to remain. Dr. Malaisrie attempted to ascertain the location of Decedent's blockage using a bronchoscope. She observed clotted blood near the bottom of the tracheotomy tube, and attempted to clear it using a saline lavage. Unable to clear the blockage, Dr. Malaisrie inserted a tube into Decedent's mouth and used an "ambu bag" to try and force air through the tube into Decedent's lungs. When those measures failed to remedy Decedent's inability to breathe, Dr. Malaisrie removed the tube from Decedent's mouth and attempted to reinsert another tube through the existing site in Decedent's neck; however, the tube went into Decedent's thorax, rather than into his trachea, as intended. As a result, when medical personnel began to force air through the improperly-placed tube, the air accumulated outside of Decedent's lungs, causing his lungs and trachea to collapse. At this point, Dr. Glasser returned to Decedent's room,

---

[2] A small amount of blood around the site of the incision post-surgery is normal.

and determined that Decedent was not getting air into his lungs. Dr. Glasser instructed that the improperly-placed tube be removed, and that Decedent again be intubated through his mouth. Once properly intubated, Decedent began to receive air into his lungs; however, by this time, Decedent had suffered cardiac arrest, and he was pronounced dead at 6:36 p.m.

Appellant, as executor of Decedent's estate, commenced a negligence action against the Hospital and several individual defendants, including Nurse Yakish, in June 2009. Appellant alleged that Nurse Yakish was negligent and deviated from the appropriate standard of care by failing to properly care for and treat Decedent following his tracheotomy procedure; by moving Decedent too soon after his tracheotomy procedure; and by failing to properly monitor, observe, and oversee Decedent following his tracheotomy procedure. See Fourth Amended Complaint, at Count IV. Appellant further alleged that the Hospital was vicariously liable, *inter alia*, for the negligence of Dr. Malaisrie.[3] Id. at Count XIII.

Relevant to the instant appeal, the Hospital filed a motion *in limine* challenging, *inter alia*, the testimony of Appellant's expert, Nurse William K. Pierce, to the extent Nurse Pierce intended to offer any opinion that Nurse Yakish's negligent acts caused Decedent's pain, suffering, or ultimate death.[4] The trial court prohibited Nurse Pierce from offering an opinion as to whether Nurse Yakish's actions were the cause of

---

[3] In his brief, Appellant asserts that medical experts did not identify Dr. Malaisrie's negligence as the cause of Decedent's injuries until after the statute of limitations on medical claims against Dr. Malaisrie had expired, which is the reason Dr. Malaisrie was not named individually as a defendant. Appellant's Brief at 8.

[4] As Decedent did not have any next of kin, but was in a same-sex relationship for which Pennsylvania, at the time, did not afford legal status, the damages claim was limited to recovery for the pain and suffering Decedent experienced during the 2 to 3 hour period preceding his death. For purposes of this opinion, we will use the term "injuries" to describe Decedent's pain and suffering.

Decedent's injuries, but did allow Nurse Pierce to offer an opinion as to whether certain actions of Nurse Yakish were negligent.

At the close of Appellant's case, the Hospital moved for a nonsuit as to all defendants, with the exception of Nurse Yakish. The following day, the trial judge granted a nonsuit as to all defendants, including Nurse Yakish. With regard to Dr. Malaisrie, the trial court acknowledged that Appellant presented expert testimony that Dr. Malaisrie had deviated from the standard of care, but concluded Appellant failed to establish that Dr. Malaisrie was an ostensible agent of the Hospital, as required under the Medical Care Availability and Reduction of Error Act, 40 P.S. §§ 1303.101-1303.910 ("MCARE Act"). Specifically, the trial court determined that Appellant failed to offer any evidence that a reasonably prudent person in Decedent's position would have been justified in the belief that the care in question was rendered by the Hospital or its agents. Id. § 1303.516(a)(1). The trial court highlighted that Appellant did not present any witnesses to testify regarding "how the agency structure of the hospital was set up regarding ENT physicians . . . in the Hospital's facilities," nor did Appellant present the testimony of Appellant's brother "as to how Dr. Malaisrie presented herself as to agency, or whether a reasonable patient would believe she was an agent of the hospital." Trial Court Opinion, 4/15/13, at 3-4. With regard to Nurse Yakish, the trial court opined that Appellant "failed to demonstrate that any action taken by or attributable to Nurse Yakish was the cause of Decedent's death." Id. at 5.

Appellant's subsequent motion to remove the nonsuit and his request for other post-trial relief were denied. On appeal to the Superior Court, Appellant argued that the trial court erred in removing the question of the ostensible agency of Dr. Malaisrie from the jury, and, additionally, erred in precluding Nurse Pierce from offering an opinion as

to whether Nurse Yakish's negligence was a medical cause of Decedent's death. A split three-judge panel of the Superior Court affirmed the trial court's order.

Judge Platt, writing the lead opinion, agreed with the trial court's conclusion that Appellant failed to present any evidence which would suggest that a "reasonably prudent person in Decedent's position would have been justified in believing that Dr. Malaisrie's care was being rendered by the hospital or its agents." Green v. Pennsylvania Hosp., 2858 EDA 2012, unpublished memorandum at 7 (Pa. Super. filed Jan. 30, 2014). Specifically, Judge Platt concluded that Appellant failed to offer any evidence "as to the extent of Dr. Malaisrie's duties or responsibilities at Pennsylvania Hospital, let alone the manner in which she presented herself to Decedent while treating him." Id. at 8-9. Acknowledging Appellant's argument that Decedent sought care from the Hospital, rather than from a specific physician, Judge Platt noted that Appellant "fails to acknowledge that, throughout the litigation, the Hospital denied that Dr. Malaisrie was its agent, nor did Appellant present evidence to establish the extent of Dr. Malaisrie's relationship with Pennsylvania Hospital." Id. at 9.

Judge Platt further rejected Appellant's contention that the trial court erred in precluding Nurse Pierce from testifying that Nurse Yakish's actions were a cause of Decedent's injuries, noting that the case on which Appellant relied in support of his argument, Freed v. Geisinger Med. Ctr., 971 A.2d 1202 (Pa. 2009), gives a trial court discretion to allow a nurse to testify as an expert on matters other than the standard of care if the court determines that the expert is otherwise competent to do so, but does not require it do to so. Judge Platt further observed that the trial court specifically found that Nurse Pierce could not testify "outside the area of his expertise," a determination Appellant failed to acknowledge. Green, 2858 EDA 2012, at 15. President Judge Gantman concurred in the result.

Judge Shogan also concurred in the result with respect to the proffered testimony of Nurse Pierce. However, regarding the ostensible agency issue, Judge Shogan dissented, concluding that the facts, when viewed in the light most favorable to Appellant, indicated that Dr. Malaisrie was involved in Decedent's care as part of the emergency team that responded to the Hospital's page when blood began to discharge from Decedent's tracheotomy site, and that, because Dr. Malaisrie attended Decedent at the request of the Hospital, not Decedent himself, the question of whether a prudent person in Decedent's position would have been justified in the belief that the care he received was rendered by the Hospital or its agents should have been decided by the jury.

Appellant filed a petition for allowance of appeal with this Court, and we granted review to consider: (1) whether the question of the Hospital's liability for the negligence of its treating physician, Dr. Malaisrie, under a theory of ostensible agency should have been presented to the jury; and (2) whether this Court's decision in Freed, supra, allows a nurse to provide expert testimony as to causation on a claim against another nurse, in an action where the plaintiff raised additional claims against doctors based on their alleged acts of negligence.

## II. Analysis

### A. Vicarious Liability for a Physician's Negligence

In order to state a cause of action for negligence, a plaintiff must allege facts which prove the breach of a legally recognized duty or obligation of the defendant that is causally related to actual damages suffered by the plaintiff. Scampone v. Highland Park Care Ctr., LLC., 57 A.3d 582, 596 (Pa. 2012). To prove the elements of a duty and the breach thereof, a plaintiff must show that the defendant's act or omission fell below the standard of care, and, therefore, increased the risk of harm to the plaintiff. Id. The

plaintiff then must demonstrate "the causal connection between the breach of a duty of care and the harm alleged: that the increased risk was a substantial factor in bringing about the resultant harm." Id.

A plaintiff may pursue a negligence action against a defendant on the theory of direct liability or vicarious liability. Under a direct liability theory, a plaintiff "seeks to hold the defendant responsible for harm the defendant caused by the breach of a duty owing directly to the plaintiff." Id. at 597. Vicarious liability, on the other hand,

> is a policy-based allocation of risk. Crowell v. City of Philadelphia, 531 Pa. 400, 613 A.2d 1178, 1181 (1992). "Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it." Id. (quoting Prosser and Keeton on Torts § 69, at 499 (5th Ed. 1984)). Once the requisite relationship (i.e., employment, agency) is demonstrated, "the innocent victim has recourse against the principal," even if "the ultimately responsible agent is unavailable or lacks the ability to pay." Mamalis v. Atlas Van Lines, Inc., 522 Pa. 214, 560 A.2d 1380, 1383 (1989); accord Crowell, 613 A.2d at 1182 (vicarious liability is policy response to "specific need" of how to fully compensate victim).

Id.

At one time, hospitals enjoyed absolute immunity from tort liability. The basis of that immunity was the perception that hospitals functioned as charitable organizations. Thompson v. Nason Hosp., 591 A.2d 703, 706 (Pa. 1991). As we recognized in Thompson, however, "hospitals have evolved into highly sophisticated corporations operating primarily on a fee-for-service basis. The corporate hospital of today has assumed the role of a comprehensive health center with responsibility for arranging and coordinating the total health care of its patients." Id. (footnote omitted).

Thus, in 1965, this Court abolished the doctrine of charitable immunity for hospitals in Flagiello v. Pennsylvania Hosp., 208 A.2d 193 (Pa. 1965). Thereafter,

> [t]he concept of hospital liability in Pennsylvania further evolved in Tonsic v. Wagner, [329 A.2d 497 (Pa. 1974),] when we held that the hospital was not as a matter of law immunized from any liability for negligence of its personnel during an operation, thereby recognizing respondeat superior as a basis for hospital liability. Subsequently, Superior Court in Capan v. Divine Providence Hospital, [430 A.2d 647 (Pa. Super. 1980),] adopted the theory of ostensible agency, when it held that the trial court erred in failing to instruct the jury that it could find the hospital vicariously liable for negligence of a physician, despite the fact the physician was an independent contractor. See also Simmons v. St. Clair [Memorial] Hospital, [481 A.2d 870 (Pa. Super. 1984)].

Thompson, 591 A.2d at 707. We also went on to recognize that a hospital could be held liable under the doctrine of corporate negligence, if the hospital fails to uphold the proper standard of care owed to a patient. Id. at 707.

The ostensible agency theory adopted in Capan, supra, is based on Section 429 of the Restatement (Second) of Torts, which provides:

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

Restatement (Second) of Torts § 429. Under the theory of ostensible agency, a hospital could be held liable for the negligence of an independent contractor physician where (1) the patient looked to the institution, rather than the individual physician, for care, or (2) the hospital "held out" the physician as its employee. Capan, 430 A.2d at 650; Simmons, 481 A.2d at 875.

In 2002, the Pennsylvania legislature enacted the MCARE Act, codifying the vicarious liability of hospitals under the doctrine of ostensible agency:

> **(a) Vicarious liability.‒**A hospital may be held vicariously liable for the acts of another health care provider through principles of ostensible agency only if the evidence shows that:
>
> (1) a reasonably prudent person in the patient's position would be justified in the belief that the care in question was being rendered by the hospital or its agents; or
>
> (2) the care in question was advertised or otherwise represented to the patient as care being rendered by the hospital or its agents.
>
> **(b) Staff privileges.‒**Evidence that a physician holds staff privileges at a hospital shall be insufficient to establish vicarious liability through principles of ostensible agency unless the claimant meets the requirements of subsection (a)(1) or (2).

40 P.S. § 1303.516.

As noted above, in the instant case, the trial court granted a compulsory nonsuit based on its finding that Appellant failed to establish that Dr. Malaisrie was the ostensible agent of the Hospital because he did not demonstrate under Section 1303.516(a)(1) that a reasonably prudent person in Decedent's position would have been justified in the belief that the care in question was rendered by the Hospital or its agents.[5] A trial court may enter a compulsory nonsuit on any and all causes of action:

> if, at the close of the plaintiff's case against all defendants on liability, the court finds that the plaintiff has failed to establish a right to relief. Absent such finding, the trial court shall deny the application for a nonsuit. On appeal, entry of a

---

[5] The parties do not dispute that subsection (a)(1) of Section 1303.516 is the only subsection at issue in the case.

compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving "the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor." The compulsory nonsuit is otherwise properly removed and the matter remanded for a new trial.

Scampone, 57 A.3d at 595-96 (citing, *inter alia*, Pa.R.C.P. No. 230.1).

On appeal, Appellant maintains that the question of what a reasonably prudent person in Decedent's position would have been justified in believing is best determined by a jury. Further, relying on Capan and Simmons, wherein the Superior Court determined that the evidence presented was sufficient to raise a jury question as to whether the doctors were ostensible agents of the respective hospitals, Appellant offers the following facts as evidence which would support a jury finding that a reasonably prudent person in Decedent's position would have been justified in believing that Dr. Malaisrie's care was being rendered by the hospital or its agents: (1) Dr. Malaisrie first became involved in treating Decedent as part of an emergency response team at the hospital; (2) Dr. Malaisrie had no prior doctor/patient relationship with Decedent; and (3) Dr. Malaisrie rendered emergency treatment to Decedent at the request of the hospital, and not at the request of Decedent or Decedent's family. Appellant's Brief at 18-19.

The Hospital responds that the "facts" now offered by Appellant are "new" in that they were not established at trial, Appellees' Brief at 17-18, and, to the extent Appellant relies on statements made during Appellant's counsel's opening statement, the Hospital avers that statements by counsel are not evidence. According to the Hospital, the totality of evidence established at trial relevant to the issue of whether Dr. Malaisrie was an ostensible agent of the Hospital was: (1) after Nurse Yakish observed increased bleeding from Decedent's tracheotomy site, "she paged anesthesia"; (2) "ENT was also contacted"; (3) Dr. Glasser, the anesthesiologist, arrived first; (4) Dr. Malaisrie, the ENT physician, arrived approximately ten minutes after Dr. Glasser; and (5) Dr. Glasser

testified at trial that he was an independent contractor, not an agent of the hospital. Id. at 19-20. Additionally, the Hospital asserts: "The patient had been 'awake and cooperative', and remained awake when Dr. Glasser arrived, and when Dr. Malaisrie arrived. The patient was 'stable' and continued to be conscious until 'sometime in the middle' of the subsequent procedure." Id. at 20 (record citations omitted). Based on this summary of the evidence, the Hospital contends that Appellant failed to offer any evidence upon which a jury could conclude that a reasonably prudent person in Decedent's position would be justified in the belief that Dr. Malaisrie rendered care as the Hospital's agent.

The Hospital further maintains that the cases upon which Appellant relies, including Capan and Simmons, do not support Appellant's position because they are factually distinguishable and predate the enactment of the MCARE Act. The Hospital contends:

> Permitting a jury to impose liability on this record would effectively nullify the legislature's enactment of section 516 (and would violate the public policy concerns underlying it) because any hospital could potentially be subject to "ostensible agent" liability for any provider, based on no evidence other than the barest fact of emergency treatment by a doctor authorized to practice in the hospital - exactly what section 516(b) prohibits. The ostensible agency "exception" would become the rule, and section 516(a)(1) would be rendered meaningless.

Appellees' Brief at 28-29.[6]

---

[6] The Pennsylvania Medical Society and the Pennsylvania Defense Institute filed a joint amicus brief, and the Hospital & Healthsystem Association of Pennsylvania filed a separate amicus brief, in support of the Hospital. The Pennsylvania Association for Justice filed an amicus brief in support of Appellant.

Initially, we cannot agree with the Hospital's argument that allowing a jury to determine whether Decedent was justified in believing that Dr. Malaisrie was acting as an agent of the Hospital when she treated Decedent will undermine and/or obviate Section 516 of the MCARE Act by subjecting a hospital to ostensible agent liability "based on no evidence other than the barest fact of emergency treatment by a doctor authorized to practice in the hospital." Appellees' Brief at 29. As noted above, Section 1303.516(b) provides that evidence that a physician holds staff privileges at a hospital "shall be insufficient to establish vicarious liability through principles of ostensible agency *unless the claimant meets the requirements of subsection (a)(1) or (2).*" 40 P.S. § 1303.516(b) (emphasis added). In order for a hospital to be held vicariously liable under Section 1303.516(a)(1), a plaintiff must establish that "a reasonably prudent person in the patient's position would be justified in the belief that the care in question was being rendered by the hospital or its agents." 40 P.S. § 1303.516(a)(1). We fail to see how allowing a jury to determine whether Appellant has demonstrated that a reasonably prudent person in Decedent's position would be justified in the belief that the care in question was being rendered by the hospital − a basis for liability specifically contemplated by the MCARE Act itself − undermines or obviates the Act, as the Hospital suggests.

Turning to the underlying question of whether a reasonably prudent person in Decedent's position would be justified in the belief that the care in question was being rendered by the Hospital or its agents pursuant to 40 P.S. § 1303.516(a)(1), as noted above, Appellant cites the Superior Court's decisions in Capan and Simmons. In Capan, the decedent was admitted to the hospital via the emergency room for treatment of a severe nosebleed. While in the hospital, the decedent developed delirium tremens and became violent. The nursing staff summoned the doctor who was on-call to answer

emergencies, and the on-call doctor administered a series of drugs to the decedent in an effort to calm him. After the on-call doctor left the hospital that evening, the decedent suffered cardiac arrest and died. The decedent's estate filed a wrongful death and survival action against the hospital and several physicians, and the trial court, *inter alia*, granted a nonsuit as to the survival action in favor of the hospital.

On appeal, the Superior Court held that the trial court erred in failing to instruct the jury that it could find the hospital vicariously liable for the negligence of the on-call doctor based on ostensible agency, despite the fact that the on-call doctor was an independent contractor. The Superior Court reasoned:

> The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and interns, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action.
>
> Thus, a patient today frequently enters the hospital seeking a wide range of hospital services rather than personal treatment by a particular physician. It would be absurd to require such a patient to be familiar with the law of respondeat superior and so to inquire of each person who treated him whether he is an employee of the hospital or an independent contractor. Similarly, it would be unfair to allow the "secret limitations" on liability contained in a doctor's contract with the hospital to bind the unknowing patient.

430 A.2d at 649 (citations omitted). The Superior Court concluded that, as the decedent had entered the hospital through the emergency room and the on-call doctor had treated the decedent in his capacity as house physician, not as the decedent's

personal physician, "the jury could have concluded that [the decedent] relied upon the hospital rather than the [on-call doctor] himself for treatment. Additionally, the jury could have found that [the hospital] held out [the on-call doctor] as its employee by providing his services for dealing with emergencies within the hospital." Id. at 650.

In Simmons, the decedent was admitted to the hospital after he was taken to the emergency room following a suicide attempt. Hospital personnel contacted Dr. Alan Wright, the on-call psychiatrist, and Dr. Wright arranged for the decedent's admission to the psychiatric unit. The decedent remained in the hospital for approximately 18 days, during which time he was treated by Dr. Wright. The decedent was readmitted to the hospital by Dr. Wright after another suicide attempt approximately five months later and placed in the "general observation" level of the psychiatric unit, where patients are observed every 30 minutes. Several days after he was admitted, the decedent used ties from hospital robes to hang himself from the plumbing fixtures in the bathroom adjoining his assigned room. The decedent's father filed suit against the hospital, and at trial attempted to introduce evidence to prove that Dr. Wright was an actual or ostensible agent of the hospital. The trial court instructed the jury that Dr. Wright was not an employee, agent, or servant of the hospital and that the hospital was not responsible for his actions. The jury returned a verdict in favor of the hospital. Following argument on post-trial motions, an *en banc* panel of the trial court granted a new trial, determining, *inter alia*, that the trial court erred in withdrawing the question of Dr. Wright's agency from the jury. The hospital appealed.

The Superior Court affirmed, concluding "there was evidence of record from which the jury may have determined that Dr. Wright was either an actual or ostensible agent" of the hospital. 481 A.2d at 873. Citing Capan, the Superior Court noted:

> Decedent herein was first admitted to [the hospital] through
> the emergency room and decedent first came in contact with

> Dr. Wright at that time because he was the "on call" emergency physician. Decedent's parents were told that Dr. Wright was the head of the psychiatry department at the hospital and that he was "qualified". Dr. Wright was the admitting physician when decedent entered the hospital the second time. Under these circumstances, we find that the jury could have concluded that decedent looked to the hospital for care and that the hospital "held out" the doctor as its employee. Thus, we find that the court *en banc* properly determined that it was error to withdraw the issue of ostensible agency from the jury.

Id. at 874-75.

The high courts of several of our sister states have taken a similar approach. For example, in Jackson v. Power, 743 P.2d 1376 (Ak. 1987), the Alaska Supreme Court held that a hospital has a non-delegable duty to provide non-negligent emergency care physicians on a 24-hour basis, and cannot "shield itself from liability by claiming it is not responsible for the results of negligently performed health care when the law imposes a duty on the hospital to provide that health care." Id. at 1385. The court limited its holding "to those situations where a patient comes to the hospital, as an institution, seeking emergency room services and is treated by a physician provided by the hospital," and declined to extend its holding "to situations where the patient is treated by his or her own doctor in an emergency room provided for the convenience of the doctor. Such situations are beyond the scope of the duty assumed by an acute care hospital." Id.

In Gatlin v. Methodist Med. Ctr. Inc., 772 So. 2d 1023 (Miss. 2000), the Mississippi Supreme Court reversed the trial court's directed verdict in favor of the hospital, holding that the question of whether the hospital was vicariously liable for the negligence of an anesthesiologist, who failed to make sure there was sufficient blood available for surgery on a patient who arrived at the hospital's emergency room with several gunshot wounds, was for the jury. In doing so, the Court emphasized that the

appropriate focus in determining whether a hospital may be held vicariously liable for the negligence of an independent contractor physician is the relationship between the patient and the health care provider, not the relationship between the hospital and its physicians:

> Where a hospital holds itself out to the public as providing a given service, in this instance, emergency services, and where the hospital enters into a contractual arrangement with one or more physicians to direct and provide the service, and where the patient engages the services of the hospital without regard to the identity of a particular physician and where as a matter of fact the patient is relying upon the hospital to deliver the desired health care and treatment, the doctrine of respondeat superior applies and the hospital is vicariously liable for damages proximately resulting from the neglect, if any, of such physicians. By way of contrast and distinction, where a patient engages the services of a particular physician who then admits the patient to a hospital where the physician is on staff, the hospital is not vicariously liable for the neglect or defaults of the physician.

772 So. 2d at 1027 (quoting Hardy v. Brantly, 471 So. 2d 358, 369 (Miss. 1985)). The Gatlin Court observed that, although there may be exceptions, a patient's non-selection of his physician is often the rule in the case of anesthesiologists, radiologists, and emergency room physicians. 772 So. 2d. at 1028; see also Paintsville Hosp. Co. v. Rose, 683 S.W.2d 255, 256-57 (Ky. 1985) (noting expansion of ostensible agency theory from anesthesiologists to other physicians who are not employed by the hospital but are furnished through the institutional process, such as pathologists, radiologists, and emergency room physicians).

In Simmons v. Tuomey Reg'l Med. Ctr., 533 S.E.2d 312 (S.C. 2000), the South Carolina Supreme Court, adopting Section 429 of the Restatement (Second) of Torts, held "a hospital owes a nondelegable duty to render competent service to its emergency

room patients." Id. at 322. Although the Tuomey case involved emergency room physicians, the court did not limit its holding to the emergency room setting, but instead restricted it:

> to those situations in which a patient seeks services at the hospital as an institution, and is treated by a physician who reasonably appears to be a hospital employee. Our holding does not extend to situations in which the patient is treated in an emergency room by the patient's own physician after arranging to meet the physician there. Nor does our holding encompass situations in which a patient is admitted to a hospital by a private, independent physician whose only connection to a particular hospital is that he or she has staff privileges to admit patients to the hospital. Such patients could not reasonably believe his or her physician is a hospital employee.

Id. at 323.

We recognize, as the Hospital points out, that the Superior Court decisions in both Capan and Simmons predate the enactment of the MCARE Act. However, the language of the MCARE Act specifically provides that "[a] hospital may be held vicariously liable for the acts of another health care provider *through principles of ostensible agency*." 40 P.S. § 1303.516(a) (emphasis added). In our view, the requirement for establishing ostensible agency under Section 1303.516(a)(1) − where the evidence must show that a reasonably prudent person in the patient's position would be justified in the belief that the care in question was being rendered by the hospital or its agents − is substantially the same as the requirement for establishing ostensible agency under Section 429 of the Restatement (Second) of Torts − where the recipient of services must demonstrate a reasonable belief that the services were rendered by the employer or by his servants. Accordingly, Capan, Simmons, and the cases from our sister states are instructive on the underlying question of whether, and under what circumstances, a reasonably prudent person in Decedent's position would

be justified in believing the care in question was being rendered by the Hospital or its agents.

Guided by these cases, and based on our review of the record, we conclude there was sufficient evidence to create a jury question concerning whether a reasonably prudent person in Decedent's position would be justified in the belief that Dr. Malaisrie was acting as the Hospital's agent when she rendered care to Decedent. It is undisputed that Decedent first entered the Hospital through the emergency room, and ultimately was admitted to the ICU. The Hospital does not dispute that, after Nurse Yakish observed blood "squirting" from Decedent's tracheotomy site, anesthesiology and ENT services were paged. See N.T., 6/5/12, at 60 (Dr. Salgo testifying that "the ENT service and anesthesiology services were asked to help. Anesthesiology showed up and so did ENT after anesthesiology."); N.T., 6/6/12, at 7 (Dr. Glasser testifying that at approximately 4:30 p.m. on January 10, 2009, "there was a page for anesthesia services to come to the Intensive Care Unit. The page we get on our beeper or an overhead page."). Dr. Glasser testified that he remained in Decedent's room "until the ENT physician arrived, and whose patient it primarily was." Id. at 11. He estimated that Dr. Malaisrie arrived in Decedent's room ten minutes after he did. Id. at 12. Dr. Glasser further testified that, shortly after Dr. Malaisrie arrived, he received another page and left the room. Id. at 42 ("I was paged to go to the other area. I wouldn't have gone to the other area, but the Doctor had arrived and she was the primary service for that patient for the tracheotomy so I did leave, yes."). When Dr. Glasser returned approximately 15 minutes later, he observed that Decedent was "stable," but coughing and "breathing on his own, possibly intermittently. They were assisting him with the bag, but it wasn't at all times. And he was stable at that time, but he was still having the coughing and bleeding a little bit." Id. at 12.

In this Court's view, when a hospital patient experiences an acute medical emergency, such as that experienced by Decedent in the instant case, and an attending nurse or other medical staff issues an emergency request or page for additional help, it is more than reasonable for the patient, who is in the throes of medical distress, to believe that such emergency care is being rendered by the hospital or its agents. Accordingly, we hold that the trial court's grant of a nonsuit under Section 1303.516(a) was erroneous in the instant case, and that the question of whether a reasonably prudent person in Decedent's position would be justified in his belief that the care rendered by Dr. Malaisrie was rendered by her as an agent of the Hospital should have proceeded to the jury. We, therefore, reverse the Superior Court's decision affirming the trial court's grant of a nonsuit in favor of the Hospital on this issue, and remand the matter for further proceedings.

## B. Preclusion of Expert Testimony

In his second issue, Appellant concedes that the trial court's entry of a nonsuit in favor of Nurse Yakish based on a lack of causation evidence tying Nurse Yakish's alleged negligence to Decedent's injuries was "undeniably correct," but contends that the absence of such evidence was the result of the trial court erroneously granting the Hospital's motion *in limine* precluding the causation testimony of Appellant's expert witness, Nurse Pierce. Appellant's Brief at 25-26. The trial court permitted Nurse Pierce to offer testimony regarding the quality of care offered by the nurses that treated Decedent, but prohibited Nurse Pierce from opining as to whether Nurse Yakish's actions were a cause of Decedent's injuries, reasoning:

> [B]ecause this was a medical professional liability action[] against a physician and Pierce did not possess an unrestricted physician's license, he was properly precluded [from offering causation testimony] under the MCARE Act's requirements under § 1303.512(b)(1). If this had been a

case, such as Freed, [supra,] involving the causation of bedsores and whether poor nursing was a (sic) the cause of the bedsores[,] Pierce would have been free [to] testify as an expert as to causation. However, since it involved liability against multiple physicians and nurses, it would have created an anomalous result to allow Pierce to testify as to causation as to the nurses, but claim he was incompetent to testify against the physicians for care that was in many places indivisible as to who was providing it. As this was the case, Pierce was properly allowed to testify regarding his expert opinion of the quality of care provided by the Defendant nurses but not as to causation of Decedent's death.

Trial Court Opinion, 4/15/13, at 9.

In arguing that the trial court erred in precluding Nurse Pierce from offering causation testimony against Nurse Yakish, Appellant suggests that the trial court based its decision on a "legally erroneous understanding of an inapplicable provision of the MCARE statute," specifically Section 1303.512. Appellant's Brief at 26. We find Appellant's argument to be without merit.

Section 512 sets forth the requisite qualifications for an expert witness testifying in a medical malpractice action against a physician:

> **(a) General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
>
> **(b) Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:
>
> (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training, or experience.

**(c) Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

\* \* \*

**(e) Otherwise adequate training, experience and knowledge.**—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512.

Appellant maintains that the MCARE Act does not preclude Nurse Pierce from offering causation testimony against Nurse Yakish, and, in support of his argument,

cites a portion of a footnote in this Court's decision in <u>Freed</u>. Therein, we acknowledged that our holding that the Professional Nursing Law did not prohibit an otherwise competent and properly qualified nurse from giving expert testimony regarding medical causation based on substandard nursing procedures might have limited impact in light of the legislature's enactment of the MCARE Act, but noted:

> there are certainly situations in which it is questionable whether the MCARE Act will apply and thus we conclude our decision today retains its vitality. For example, the MCARE Act, by its terms, appears to apply only to medical professional liability actions against physicians, and not to other professional liability actions, or to actions *against non-physician health care providers*.

<u>Freed</u>, 971 A.2d at 1212 n.8 (emphasis added).

Regardless of the requirements for expert witnesses in medical malpractice actions against physicians under the MCARE Act, or the language of <u>Freed</u>, the MCARE Act does not *mandate* the admission of a given expert's testimony. Rather, decisions regarding the admission of expert testimony are left to the trial court's discretion, and will not be disturbed absent an abuse of discretion. <u>Commonwealth v. Towles</u>, 106 A.3d 591, 605 (Pa. 2014). Further, and critically herein, a trial court may exclude expert opinion testimony if the probative value of the testimony is outweighed by the potential to cause confusion or prejudice. <u>Houdeshell v. Rice</u>, 939 A.2d 981, 986 (Pa. Super. 2007); Pa.R.E. 403 (court may exclude relevant evidence if its probative value is outweighed by a danger, *inter alia*, of confusing the issues or misleading the jury).

As the trial court noted, the instant case involved negligence claims against both nurses *and* physicians. The trial court determined that allowing Nurse Pierce to offer causation testimony as to Nurse Yakish, but not the physicians (which he was not qualified to do), might confuse the jury, and the Superior Court affirmed the trial court's

ruling, rejecting Appellant's suggestion that, pursuant to <u>Freed</u>, <u>supra</u>, the trial court was required to allow Nurse Pierce to offer expert causation testimony. Appellant fails to argue, let alone establish, that the trial court abused its discretion in this regard. Indeed, in his expert report, Nurse Pierce opined that Nurse Yakish "failed to adequately assess/follow up bleeding from [Decedent's tracheotomy]," and that "[t]he team attending to [Decedent] during his crisis failed to react promptly to the need for the [tracheotomy] cuff to be inflated and failed to adequately assess airway placement. As a result of this negligence, Mr. Fusco suffered a cardiopulmonary arrest and died." Expert Report of William K. Pierce, 6/1/11, at 5 (R.R. at 303a). Thus, based on the expert report, the proffered expert causation testimony of Nurse Pierce was based on a course of conduct by nurses *and* physicians, and, as the trial court observed, had the potential to confuse the jury. Accordingly, we hold that Appellant is not entitled to relief on this issue.

### III. Conclusion

For the reasons set forth above, we affirm the Superior Court's decision to the extent it affirmed the trial court's grant of a nonsuit in favor of Nurse Yakish. However, we reverse the Superior Court's order affirming the trial court's grant of a nonsuit in favor of the Hospital, and remand the matter to the Superior Court, for remand to the trial court, for further proceedings consistent with this opinion.

Order affirmed in part and reversed in part. Case remanded.

Mr. Chief Justice Saylor, Messrs. Justice Eakin, Baer and Stevens join the opinion.