J-A29042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RALPH SMITH AND ANNA SMITH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | :: | |
| v. | : | |
| | : | |
| WEST PENN ALLEGHENY HEALTH | : | |
| SYSTEM, INC. D/B/A ALLEGHENY | : | |
| GENERAL HOSPITAL; DR. | : | |
| ALEXANDER YU; HEALTHSOUTH | : | |
| REHABILITATION HOSPITAL OF | : | |
| SEWICKLEY, LLC D/B/A | : | |
| HEALTHSOUTH REHABILITATION | : | |
| HOSPITAL OF SEWICKLEY; VALLEY | : | |
| MEDICAL FACILITIES, INC. D/B/A | : | |
| HERITAGE VALLEY BEAVER; AND | : | |
| DR. AMARJEET SINGH | : | No. 299 WDA 2022 |

Appeal from the Order Entered February 4, 2022,
in the Court of Common Pleas of Allegheny County,
Civil Division at No(s):  GD-17-12618.

BEFORE:  BENDER, P.J.E., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.:　　　　　　　**FILED: JANUARY 19, 2023**

In this medical-malpractice action, Ralph and Anna Smith appeal from the order granting summary judgment to the defendants, Valley Medical Facilities, Inc., d/b/a Heritage Valley Beaver; West Penn Allegheny Health System, Inc., d/b/a Allegheny General Hospital; Dr. Alexander Yu, MD; Dr. Amarjeet Singh, MD; and HealthSouth Rehabilitation Hospital of Sewickley, LCC, d/b/a HealthSouth Rehabilitation Hospital of Sewickley.  The trial court dismissed the lawsuit after determining that, as a matter of law, the Smiths'

expert witnesses were unqualified to testify against the defendant doctors and corporations on the standard of care and on causation. We affirm.

The Smiths believe that the defendants breached the standard of care by failing to discontinue a prescription for Dilantin, which Dr. Yu originally gave to Mr. Smith to treat his seizures. Even though the Smiths sued doctors and corporate hospitals, they did not procure an expert witness from either profession. Instead, they offered the expert reports and testimony of two nurses: Kari Halaut, CRNP and Deborah Nelson, RN.

The defendants therefore filed motions *in limine* to exclude this expert testimony. They argued that the nurses were not qualified to opine on the negligence of doctors or corporate hospitals. The trial court agreed and granted the motions. An order dismissing the Smiths' case with prejudiced followed, which is a grant of summary judgment for purposes of this timely appeal.

The Smiths raise five issues, which we have reordered below for ease of disposition. They are as follows:

1.    Whether the trial court's decision is discernable from the record?

2.    Whether the trial court's decision is supported by the evidence?

3.    Whether the trial court considered inappropriate matters in dismissing this case with prejudice?

4.    Whether a conciliation conference was properly convened?

5. Whether the trial court committed an error of law and an abuse of discretion by disqualifying [the Smiths'] expert(s)?

Smiths' Brief at 4.

We begin by discussing the first four appellate issues together, which the Smiths have waived.

"The issue of waiver presents a question of law, and, as such, our standard of review is *de novo*, and our scope of review is plenary." ***Trigg v. Children's Hosp. of Pittsburgh of UPMC***, 229 A.3d 260, 269 (Pa. 2020).

As the late Chief Justice Baer said, our "rules of appellate procedure are explicit that the argument within a brief must contain 'such discussion and citation of authorities as are deemed pertinent.'" ***Wirth v. Commonwealth***, 95 A.3d 822, 837 (Pa. 2014) (quoting Pa.R.A.P. 2119(a)). "Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority . . . that claim is waived. It is not the obligation of an appellate court to formulate appellant's arguments for him." ***Id.*** (some punctuation omitted). "Moreover, because the burden rests with the appealing party to develop the argument sufficiently, an appellee's failure to advocate for waiver is of no moment." ***Id.***

Here, the Smiths cite no statute, rule, or any case law in the argument section of their brief for the first four issues listed above. ***See*** Smiths' Brief at 7-9, 11-12. Their entire argument on all four of these issues combined takes less than 5 pages of the brief. They have not developed a legal analysis

capable of appellate review. Their arguments on these four issues are woefully inadequate, and "we shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument; instead, we will deem the issue to be waived." *Commonwealth v. Pi Delta Psi, Inc.*, 211 A.3d 875, 884–85 (Pa. Super. 2019).

Thus, we dismiss the Smiths' first four issues as waived.

The Smiths have preserved only one issue for our review. It concerns the trial court's order precluding the Smiths' experts from testifying. However, the Smiths misapprehend our standard of review for evidentiary issues such as this. They claim our standard of review is *de novo*, and our scope of review is plenary. *See* Smiths' Brief at 3. They are incorrect.

"A trial court's decision to grant . . . a motion *in limine* is subject to an evidentiary abuse of discretion standard of review." *Parr v. Ford Motor Co.*, 109 A.3d 682, 690 (Pa. Super. 2014). An "abuse of discretion is not merely an error of judgment, but if, in reaching a conclusion, the law is overridden or misapplied; or the judgment exercised is manifestly unreasonable; or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Commonwealth ex rel. Hartranft v. Hartranft*, 407 A.2d 389, 391 (Pa. Super. 1979).

Because the Smiths did not make an abuse-of-discretion argument but, rather, argued the issue of the expert witnesses as if our standard of review were *de novo*, they have not persuaded us that an abuse of discretion

occurred. Smiths' Brief at 9-11. In fact, based upon the well-reasoned and through opinion of the learned Judge Philip A. Ignelzi, writing for the Court of Common Pleas of Allegheny County, we are convinced that the trial court did not abuse its discretion by granting the defendants' motions *in limine*. The trial court correctly explained that, under the MCARE statute and precedents applying it, nurses are not qualified to testify in medical-malpractice cases against doctors and corporate-hospital defendants. Trial Court Opinion, 7/26/22, at 5-17. The Smiths' reliance on **Freed v. Geisinger Medical Center**, 971. A.2d 1202 (Pa. 2009), the only case they cited, is entirely misplaced for the reasons explained by Judge Ignelzi. **Id**.

We adopt the trial court's opinion as our own and hereby direct the parties to attach its Rule 1925(a) Opinion to this Memorandum in all future proceedings.

Order affirmed.

President Judge Emeritus Bender joins the Memorandum.

Judge Olson concurs in the result.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>1/19/2023</u>

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

RALPH SMITH and ANNA SMITH,

      Plaintiffs,

v.

WEST PENN ALLEGHENY HEATH SYSTEM, INC. d/b/a ALLEGHENY GENERAL HOSPITAL; DR. ALEXANDER YU; HEALTHSOUTH REHABIILIATION HOSPITAL OF SEWICKLEY, LLC d/b/a HEALTHSOUTH REHABILITATION HOSPITAL OF SEWICKLEY; VALLEY MEDICAL FACILITIES, INC. d/b/a HERTIAGE VALLEY BEAVER; and DR. AMARJEET SINGH,

      Defendants.

CIVIL DIVISION

No. GD- 17-12618

**OPINION**

## Procedural History and Facts

This is a medical malpractice action that was listed for trial on February 4, 2022. All defendants filed Motions in Limine to preclude the testimony of Kari Halaut, CRNP ("Halaut CRNP") and Deborah Nelson, RN ("Nelson RN"). *Electronic Court Record ("ECR"),* GD 17-012618, #172. Plaintiff's counsel was attempting to have a certified registered nurse practitioner and a registered nurse provide expert testimony against doctors and other healthcare providers. The defendants were Valley Medical Facilities, Inc., d/b/a Heritage Valley Beaver, West Penn Allegheny Health System, Inc., d/b/a Allegheny General Hospital,

1

Dr. Alexander Yu, MD, Dr. Amarjeet Singh, MD, and HealthSouth Rehabilitation Hospital of Sewickley, LCC d/b/a HealthSouth Rehabilitation Hospital of Sewickley.

The Court held a hearing on the Defendant's motions in limine on February 4, 2022 (Motions in Limine Transcript ("MILT"), February 4, 2022). After reviewing the Defendant's motions in limine, briefs in support, and Plaintiff's response thereto and the extensive arguments of all counsel, the Court granted Defendant's motions in limine precluding the testimony of Plaintiff's experts Halaut CRNP and Nelson RN. Accordingly for all intents and purposes the Plaintiff's case was dismissed as a result of the Court's actions.

Since the Court dismissed Plaintiff's case by the granting of the motions in limine the facts cited in this opinion will be stated in the light most favorable to the Plaintiff. The Court will detail the facts directly from the reports of experts Halaut CRNP and Nelson RN. Halaut CRNP filed one report dated May 23, 2019, consisting of five pages (ECR # 163, Exhibit C). Nelson RN filed an initial reported dated March 8, 2020, consisting of five pages (*Id.* at Exhibit D). She then filed a supplemental report dated July 14, 2020, consisting of five pages (*Id.* at Exhibit E). As noted by the Court at argument, the report of Halaut CRNP and the initial report of Nelson RN are virtually identical. (MILT, P.22, L.11 – P.23, L.17). The supplemental report of Nelson RN has minor changes such as four additional items which Nelson RN reviewed, however, the Analysis/Opinions section of the first report and the Diagnostic/Causation section of the supplemental report render the same conclusions and opinions.

By way of history, on September 23, 2015, after falling at home, Plaintiff, Ralph J. Smith ("Mr. Smith"), was admitted to Allegheny General Hospital (AGH) with a subdural

2

hematoma. Dr. Alexander Yu performed a craniotomy upon Mr. Smith for the evacuation of the subdural hematoma. Mr. Smith suffered seizure-like episodes for which Dr. Yu prescribed Phenytoin (Dilantin), 300 milligrams by mouth, twice daily. Mr. Smith remained at AGH until September 29, 2015.

On September 29, 2015, Mr. Smith was transferred to HealthSouth Rehabilitation Hospital, where he remained until October 13, 2015. Dr. Amarjeet Singh, Mr. Smith's physician for several years, evaluated Mr. Smith on September 29, 2015, for admission to HealthSouth. Dr. Singh's evaluation indicates that Mr. Smith displayed dysarthria, lethargy, cognitive impairment, weakness, and debilitation, symptomatic of an adverse reaction to Dilantin. Dr. Singh continued Mr. Smith on the Dilantin, in the amount of 200 milligrams, twice daily. Dr. Singh's 9/29/2015 Admission Evaluation for Mr. Smith stated that "[w]e will check Dilantin level at a later date." It is noted that Dr. Singh continued to prescribe the Dilantin as late as October 13, 2015.

While at HealthSouth, Mr. Smith developed a red, itchy rash, symptomatic of an adverse reaction to Dilantin. Plaintiff Anna Smith, the wife of Mr. Smith, informed HealthSouth personnel about Mr. Smith's skin condition. HealthSouth did not order or perform a skin biopsy and continued to administer the Dilantin, 200 milligrams, twice per day.

Mr. Smith went to the Heritage Valley's emergency department on October 28, 2015, for treatment of his rash. Heritage Valley records indicate that Mr. Smith's rash "was felt to be possibly due to Dilantin." Despite this indication, Heritage Valley doctors did not

discontinue/substitute the Dilantin and did not order or perform a skin biopsy. Heritage Valley treated Mr. Smith with Prednisone and Benadryl and discharged him the same day.

On October 30, 2015, at the direction of Dr. Singh, Mr. Smith returned to Heritage Valley's emergency department. Heritage Valley's medical records indicate a "generalized maculopapular rash over entire body besides some swelling of oral and nasal mucosa" and a "diffuse erythematous rash on anus, legs, stomach chest and back" symptomatic of an adverse reaction to Dilantin. On admission to Heritage Valley, Mr. Smith's Dilantin level was 14.7%, continued Mr. Smith on Dilantin, 200 milligrams by mouth, twice daily and recommended that Mr. Smith be injected with 100 milligrams of Dilantin. Heritage Valley did not order or perform a skin biopsy.

On November 1, 2015, Heritage Valley life-flighted Mr. Smith to AGH, where he was admitted to the Intensive Care Unit. AGH performed a skin biopsy which tested positive for Steven Johnson's Syndrome (SJS) and/or Toxic Epidermal Necrolysis (TEN). On November 5, 2015, AGH transferred Mr. Smith to the burn unit of West Penn Hospital for emergency burn treatment. On November 5, 2015, Mr. Smith had lesions on his lips, hard palate, buccal mucosa and tongue, and he was unable to open his mouth due to swelling. Mr. Smith was in septic shock, acute respiratory failure, acute kidney injury, extensive oral and pharyngeal sloughing and copious bleeding. His respiratory status was compromised by the lesions in his mouth. West Penn Hospital administered Mr. Smith fentanyl and analgesia for pain and inserted central lines to administer antibiotics, analgesia, multiple blood products, fluids and sedation. Records indicate that he had lesions covering all four extremities, his face and ears, and burns over 30% of his body.

4

On November 8, 2015, Mr. Smith was weeping plasma through his skin, requiring transfusions. West Penn Hospital was unable to wean Mr. Smith from vent dependency and performed a tracheostomy on November 17, 2015. Photographs taken of Mr. Smith while at West Penn Hospital confirm his condition. Mr. Smith, an African American, displays prominent white scarring on his trunk, extremities, neck and head, which will be permanent. He has a permanent, visible tracheostomy scar.

Mr. Smith developed acute kidney injury from the SJS which is worsening. He is currently being treated for his chronic kidney disease by Dr. Pradip Teredesai and undergoes home hemodialysis. He has hypertensive nephrosclerosis as a result of the SJS.

As is evident from the detailed facts this is a very sad and tragic case. Plaintiff's theory of the case is the defendants failed to discontinue Dilantin and/or perform or order skin biopsies to detect the source of the injury. (MILT, P.20, L.5-15). The only thing more tragic and sad is Plaintiff's counsel's failure to obtain expert reports and/or testimony from a physician/doctor on the applicable standard of care and causation for the Plaintiff's injuries. Plaintiff's counsel believes common sense and reports/testimony from a CRNP and an RN is sufficient. Plaintiff counsel's argument is directly contrary to both the MCARE statute and case law.

**Discussion**

Plaintiffs in medical malpractice actions must produce expert reports to support the standard of care and causation elements of their claims where the ultimate determinations of standard of care and causation lay beyond the knowledge or expertise of the average layperson. *Hamil v. Bashline,* 392 A.2d 1280 (Pa. 1978). In addition, the MCARE statute is

5

very clear in the requirements it sets forth for expert witnesses providing opinions in

medical malpractice cases:

> **(a) General rule. --**No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
>
> **(b) Medical testimony. --**An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:
>
>> (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.
>>
>> (2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

40 P.S. § 1303.512

The proposition here is one of apples to apples and oranges to oranges. CRNPs and

RNs while they are undoubtably critical parts of healthcare, are not qualified to the same

manner and degree as a physician. With the experts in this matter, you have a case of

apples to papayas. In 2015 the Supreme Court of Pennsylvania specifically addressed 40

P.S. §1303.512 in *Green v. Pennsylvania Hospital,* 123 A.3d 310 (Pa. 2015). In that case

plaintiff attempted to have a nursing expert testify as to the nursing standard of care and

causation when the care at issue involved both nurses and physicians. *Id* at 323-325. The

trial court recognized the nursing expert was qualified as to both issues regarding the

nurse's action. The Court precluded the nursing expert's testimony because the expert was

not qualified to testify on causation as to the physicians. The trial court held causation

testimony by the nursing expert as to the nurses' actions would confuse the jury since the

nursing expert could not testify regarding causation as to the physicians. Both the Superior

6

Court and the Supreme Court concluded the trial court did not abuse its discretion in precluding the testimony of the plaintiff's nursing expert.

In the case at hand, there is no allegation by the Plaintiff regarding the actions of any nurses and/or certified registered nurse practitioners. The Court has reviewed the original Complaint, Amended Complaint, and Second Amended Complaint (ECR#'s 10, 94, 114). Several paragraphs in the complaints make reference to "respective agents, ostensible agents, servants, representatives, and/or employees" (ECR# 10, para. 82). The only paragraph that utilizes either the word "nurse" and/or "nurse practitioner" is paragraph seven (7) in all complaints. (ECR#'s 10, 94, 114. para 7). This paragraph states:

> At all times material, to the facts set forth in this Complaint, all Defendants, nurses and other healthcare personnel who observed, cared for and/or treated Mr. Smith were the agents, ostensible agents, servants, representatives and/or employees of one or more of the named Defendants in this Complaint, and were acting while in and upon the business of said Defendants and while in the course of their employment.

*Id.*

As importantly, the expert reports filed do not address the actions of any nurses and/or nurse practitioners as well as not addressing the name of any nurses and/or nurse practitioners. (ECR #'s 163, Exhibits C, D, E) What is clear from the complaints and Plaintiff's expert's reports is Plaintiff's theory of the case. Plaintiff alleges he was placed on the seizure medication Dilantin which caused a rash, welts, and lesions. This condition is referred to as Steven Johnson's Syndrome ("SJS") and/or Toxic Epidermal Necrolysis ("TEN"). Plaintiff contends other seizure medication should have been utilized to prevent the aforementioned condition. Plaintiff contends the condition was not identified in adequate time to prevent a severe adverse reaction by either discontinuing Dilantin and/or

using another seizure medication. Plaintiff further contends appropriate testing and/or skin biopsies were not performed to detect the condition. The actions of the Defendants that Plaintiff takes umbrage with are the decisions of doctors/physicians. None involve nursing care and/or nurse practitioner actions.

Plaintiff's contentions as stated above, were confirmed at argument on February 4, 2022. Plaintiff's counsel conceded there were no signs or symptoms of either SJS or TEN from September 23 to September 29, 2015. (MILT at P.15, L.15 – P.16, L.16). The Court summarized the plaintiff's contentions and Defendant's positions (MILT at P.8, L.5 – P.11, L.15 & P.15, L.15 – P.17, L.23). The Court specifically asked Plaintiff's counsel if she agreed with the positions as stated by the Court, at which time Plaintiff's counsel acknowledged the Court accurately stated the positions of the parties. (*Id.* at P.17, L.17-23).

The rationale articulated by the *Green* court has even more bearing in a case such as this where there is no identifiable actions or inactions by nurses and/or nurse practitioners which caused or contributed to Plaintiff's injury. All the actions and/or inactions alleged by Plaintiff involve doctors and/or physicians. This is likewise the case in Plaintiff's claim of corporate negligence against the various Defendants because the foundations of those claims involve the actions and/or inactions of physicians.

Plaintiff's counsel cited *Freed v. Geisinger Medical Center,* 971 A.2d 1202 (Pa. 2009) at the time of argument in support of her position. (MILT at P.33, L.23 – P.34, L.8). Plaintiff argued *Freed* allows a nurse to testify as an expert where both the medical condition and it's cause is not disputed. *Id.* In the first instance, this argument fails because both the medical condition and its cause are vigorously contested by the Defendants. *Id.* at P.12, L.2

8

– P.15, L.14; P.18, L.7 – P.22, L.13; P.23, L.21 – P.28, L.22 & P.38, L.16 – P.39, L.20. Not only was this addressed by the Defendant's at argument, but a review of several of Defendant's expert reports also thoroughly support the contention Defendants are contesting all issues in this case. By way of example, Valley Medical Facilities, Inc.'s expert Dr. Michael C. Bond, MD, FACEP, FAAEM opined in his May 15, 2020, report:

> It is unclear from the expert reports and medical records if this was truly Stevens-Johnson Syndrome (SJS) or DRESS as there is considerable overlap between the two entities. However, it is clear that he had no symptoms consistent with either condition until a faint rash was noticed by a visiting nurse after his discharge from HealthSouth. Further, his symptoms were non-specific and consistent with multiple other disease process when he presented to Heritage Valley Beaver on October 28, 2015.

Pretrial Statement of Valley Medical Facilities, Inc., ECR #156

> Dr. Mark P. Seraly opines the following in defense of the actions of Dr. Singh:

> It is my opinion that Dr. Amarjeet Singh was not negligent for failing to timely diagnose Stephens-Johnson syndrome secondary to Dilantin (phenytoin). The plaintiff, Mr. Ralph Smith, did not have Stephens-Johnson syndrome as described in the complaint based on his clinical presentation, clinical and laboratory findings, skin pathology results or documented clinical course. Plaintiff Smith experienced a rare serious adverse drug reaction called DRESS or drug reaction with eosinophilia and systemic symptom (also known as DIHS or Drug-induced hypersensitivity syndrome).

*Id.*

> Dr. Ari B. Gutman, MD a board-certified dermatologist retained by Defendant

HealthSouth opines:

> Within a reasonable degree of medical certainty, Mr. Smith suffered from Stevens-Johnson syndrome (SJS) secondary to oral Dilantin. The fact that Mr. Smith developed SJS is truly unfortunate. However, within a reasonable degree of medical certainty, <u>his SJS was not the result of any deviation in the standard of care on the part of HealthSouth, or anyone acting on its behalf.</u> ***During his admission at HealthSouth, Mr. Smith did not experience any signs or symptoms of SJS, and there was absolutely no medical reason to suspect that Mr. Smith would develop SJS.***

Pretrial Statement of Defendant HealthSouth, ECR #75. (emphasis in original)

9

*Freed* is directly inapposite to the facts at hand. The complaint in *Freed* alleged the nursing staff of both Geisinger and HealthSouth failed to meet the nursing standard of care with regard to the treatment and prevention of pressure wounds on an immobilized patient. *Freed* at 1205. The Court addressed at footnote two (2) of the opinion, the parties stipulated to dismissing the only physicians initially named, Richard C. Hale, D.O. and Richard Allatt, MD. *Id.* Thus, a physician's care was not at issue. Finally, the appellant healthcare providers in *Freed* never addressed or raised the applicability of 40 P.S. §1303.512 to the facts before the *Freed* court. *Id.* at 1212, fn.8.

Halaut CRNP and Nelson RN are not qualified as physicians, yet they wish to testify against physicians. Reiterating, while CRNPs and RNs are a critical part of the care team and may have experience dealing with cases such as this, they do so at the direction and under the supervision of physicians. Our Supreme Court has held, although there may be some overlap between the practical application of two, distinct areas of medicine, an expert is properly precluded from testifying against a physician when he or she does not possess an unrestricted physician's license. *Wexler v. Hecht,* 928 A.2d 973, 981 (Pa. 2007). While the plaintiff's counsel takes issue with several defendants administering the Dilantin, she willfully ignores the fact it was done so at the direction of a physician, yet she brings forth no physician to opine in the alternative. A plaintiff in a medial malpractice action must produce an expert who will testify that the acts of a physician deviated from the standard of care within a reasonable degree of medical certainty. *Mitzfelt v. Kamrin,* 584 A.2d 888, 892 (Pa. 1990).

As recently as 2019 our Supreme Court emphasized expert testimony is an indispensable requirement in the typical medical malpractice case. "Expert testimony in support of the plaintiff's claim is an indispensable requirement in establishing a plaintiff's right of action, as the treatment and injury typically involved are such that the common knowledge or experience of a layperson is insufficient to form the basis for passing judgment." *Mitchell v. Shikora*, 209 A.3d 307, 315 (Pa. 2019).

As previously stated, Defendant's vigorously contest any breach of the standard of care occurred as well as the other elements of a cause of action, namely causation and damages. Plaintiff consistently argued at the hearing that a nurse's and/or nurse practitioners' testimony is sufficient because the causation and the diagnosis is undisputed in this case. (MILT, P.31, L. 6-12). Plaintiff argues because various defendant doctors, Dr. Yu and Dr. Singh, reference a diagnosis of SJS as a result of the medication Dilantin the medical records alone allow Plaintiff to meet their burden of proof. Plaintiff's counsel stated the following:

> It wasn't a nurse or a nurse practitioner that diagnosed Mr. Smith with Stevens-Johnson syndrome or that the cause of it was Dilantin. Dr. Yu himself said it. He was still a neurosurgeon when he said it himself, that he has a rash and Stevens-Johnson syndrome as a result of the Dilantin. Dr. Singh himself also said it, that it was a Dilantin induced rash.

MILT, P.31, L.12-20.

> Further in the transcript Plaintiff's counsel again states:

> He was a neurologist then, he is a neurologist now. He has made causation determinations, he has made diagnoses. So, my clients aren't doing that. They're simply reviewing records which they are perfectly confident to do. In any event, they are records they are reviewing. Even a caveman can understand them. It doesn't particularly need any particular type of expertise to read these reports and understand what's going on,...

*Id.* at P.33, L.13-23.

The obvious flaw with Plaintiff's argument is none of the medical records address or discuss the standard of care, whether it was breached, and how this caused Plaintiff's injuries. If Plaintiff's argument is extended to its logical conclusion a plaintiff would meet their burden of proof in a medical malpractice trial, simply by introducing the medical records and having anyone read those records to the jury. Plaintiff would have the jury believe that simply because a certain result was reached the conduct leading to the result was a de-facto breach of the standard of care. If we accept Plaintiff's argument, we have now entered "The Twilight Zone" and merely await the entrance of Mr. Rod Sterling to make his announcement!

To give Plaintiff's counsel the benefit of the doubt this Court went back and reviewed all of the summary judgment motions and briefs by Defendants as well as Plaintiff's briefs in response. (ECR#'s 79, 92, 93, 95, 96, 98, 99, 100, 105, 106, 107, 111, 112, 113, 136, 138, 139). The Court conducted this analysis to determine if Plaintiff made any argument at summary judgment that would aid and assist the Plaintiff in defending against the Defendant's motions in limine.

The Court has already addressed the first and foremost hurdle Plaintiff's counsel is unable to overcome is 40 P.S. §1303.512 of the MCARE Act. Plaintiff's counsel addressed this issue in opposing Valley Medical Facilities, Inc., d/b/a Heritage Valley Health System's motion for summary judgment as follows:

> Much of Heritage Valley's witness qualification arguments center upon the application of the MC ARE Act; however, the MCARE Act itself states that a Court may waive the requirements for an expert testifying as to a standard of care if that person "possesses sufficient education, training, knowledge and experience to provide credible, competent testimony" (MCARE Act §512(a)), is "trained in the diagnosis or treatment of the condition" (MCARE Act §512( d) ), or if the court

12

determines that the expert possesses sufficient training, experience and knowledge to provide the testimony (MCARE Act §512(e)). 40 P.S. § 1303.512(a), et seq.).

ECR #100.

In opposing HealthSouth's motion for summary judgment Plaintiff made the

identical argument as follows:

> HealthSouth argues that the MCARE Act disqualifies plaintiffs' proffered experts; however, the MCARE Act itself states that a Court may waive the requirements for an expert testifying as to a standard of care if that person "possesses sufficient education, training, knowledge and experience to provide credible, competent testimony" (MCARE Act §512(a)); is "trained in the diagnosis or treatment of the condition" (MCARE Act §512(d)); or if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony (MCARE Act §512(e)). 40 P.S. § 1303.512(a), et seq.).

ECR #107.

Plaintiff's counsel's statements are in error because Plaintiff's counsel either

negligently conflated subsections of §1303.512 to reach the conclusion Plaintiff desired or

purposefully conflated the subsections to perpetrate a fraud upon this Court. Subsections

(a) and (b) have no exception regarding the standard of care. Subsections (1) and (2) of

subsection (b) must be met. The only exception is if the Court permits testimony on an area

other than the standard of care such as causation. The exception states:

> Provided, however, the court may waive the requirements of this subsection for an expert on a matter **other than the standard of care** if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

40 P.S. §1303.512(b) (**emphasis added**).

Plaintiff's counsel's language "the MCARE Act itself states that a court may waive the

requirements for an expert testifying as to a standard of care" is not found in subsections

(a) and (b). The only time a court has discretion is found in subsection (e) which relates to

waiving the subspecialty and board certification requirements found at subsections (c) and

13

(d). As is clear from Plaintiff's brief she took the language of subsections (d) and (e) and quoted them as if they pertained to subsections (a) and (b). At worst Plaintiff's counsel attempted to commit a fraud upon the Court at a minimum this violates counsel's ethical duty of candor.

In Plaintiff's briefs responding to summary judgment, Plaintiff's counsel made a similar argument as made before this Court during the motions in limine. In essence, Plaintiff's counsel argued since this case does not involve medically complex issues it is appropriate for a nurse and certified nurse practitioner to testify. Plaintiff's counsel stated the following:

> In the instant case, Plaintiffs' witnesses, a nurse practitioner and a nurse, have been engaged for the purpose of interpreting Mr. Smith's medical records. Although they are both fully equipped to read medical records by their experience and training, Plaintiffs submit that the ability to read medical records and to understand medical terminology is not even necessary for this case. The pertinent medical records that contain Mr. Smith's diagnosis and the cause, are written in plain, non-medical English that a layperson can understand.

ECR #100.

In their summary judgement briefs Defendants cited a Supreme Court case, *Quinby v. Plumsteadville Family Practice, Inc.,* 907 A.2d 1061 (Pa. 2006). *Quinby* involved a quadriplegic patient who had a small lesion removed from his head. Plaintiff was placed on the examination table by the defendants that did not have any side rails or other restraining devices. The plaintiff was left unattended by the defendants. When the defendants returned to the examination room the quadriplegic patient was on the floor having suffered injury. Plaintiffs called an expert to establish the defendant's had not complied with the standard of care which required them to ensure the plaintiff was left safely and securely on the examination table at all times. *Id.* at 1067. Plaintiffs also sought a

14

*res ipsa loquitur* charge which the trial court denied. *Id.* at 1068. The jury returned a verdict in favor of defendants finding no negligence. *Id.* at 1069. Both the Superior Court and Supreme Court reversed holding a *res ipsa loquitur* charge was appropriate. *Id.* at 1069 & 1073.

The Court summarized Pennsylvania law in medical malpractice cases stating, "with all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation." *Id.* at 1070-1071. In discussing *res ipsa loquitur* the court referenced its plurality opinion in *Toogood v. Rogal et al.,* 824 A.2d 1140 (Pa. 2003) which discussed whether the *res ipsa* doctrine could relieve a plaintiff's burden of producing expert testimony to demonstrate negligence in a case that was medically complex. *Id.* at 1073. *Toogood* held in a medically complex case beyond the lay knowledge of a jury the plaintiff could not rely upon the *res ipsa* doctrine to forgo producing expert testimony. *Id. Quinby* distinguished *Toogood* on the proposition it was a non-binding plurality opinion and the procedure in *Quinby* was a non-complex medical scenario. *Id.*

The facts in the present case are unquestionably a complex medical scenario. This is supported by the Defendant's experts which this Court has addressed earlier in this Opinion. As importantly, even in the non-complex medical scenario of *Quinby*, the plaintiff nonetheless provided expert testimony.

It is clear to this Court in reading the relevant caselaw it is rare that a plaintiff can abstain from calling an expert on the standard of care and causation in a medical malpractice case. The cases which grant this relief to the plaintiff involve simple cases

15

where, by way of example, a plaintiff falls off a surgical or examination table. *Grossman v. Barke,* 868 A.2d 561 (Pa. Super. 2005); *Matthews v. Clarion Hospital,* 742 A.2d 1111 (Pa. Super. 1999).

Plaintiff's counsel made one final argument at the time of summary judgment to support her contention the Plaintiff was not required to call expert physicians/medical doctors. Plaintiff's counsel proffered the following argument:

> Constitutional Concerns:
>
> Heritage Valley urges an outcome that would restrict justice to only the well-to-do and that would have a disparate impact on the African-American community, of which Mr. and Mrs. Smith are members. "[T]he right to access to the courts is fundamental to our system of justice … [if] representation is absent because of a litigant's poverty, then likely so is justice…" *Chambers v. Baltimore & Ohio R.R. Co.,* 207 U.S. 142, 148 (1907).

ECR #100.

This argument suggests our court system has allowed the perpetration of a statutory scheme designed to restrict the access of the poor and racial minorities in prosecuting a medical malpractice action. Nothing could be further from the truth and belies counsels' naivety. As a plaintiff's medical malpractice lawyer for twenty-two years this member of the Court had the honor and the privilege of representing the class of persons identified by plaintiff's counsel. In this Court's almost five years on the bench in the Civil Division this Court has seen other prominent medical malpractice attorneys and firms representing clients from all walks of life. The distinction lies not with the client but with the actions of counsel. A seasoned and experienced medical malpractice counsel prosecutes cases on a contingent fee basis providing all necessary costs and expenses including the fees of expert witnesses. By counsel fulfilling their ethical obligation and duty a fair playing

field is established. Plaintiff's counsel's choice to not expend the funds necessary to obtain proper expert witnesses is what caused the disastrous result before the Court.

Plaintiff counsel's lack of understanding in this regard is deeply concerning to this Court. Even more deeply concerning is on the eve of trial, counsel was unaware one of her expert witnesses had been arrested for charges related to the falsification of prescriptions and when confronted with this information was confused as to which expert was the one arrested. (MILT at P.37-38). The Court recites these facts to establish a consistent pattern of a lack of knowledge of the law and the specific facts of the case being prosecuted by Plaintiff's counsel.

Of additional concern is the content of plaintiff counsel's Concise Statement of Errors Complained of on Appeal. (Concise Statement of Errors Complained of on Appeal ("Concise Statement", ECR #187). Counsel's allegations of error border upon being willfully obtuse. It should be noted not a single error alleged is supported by any citation to any authority whatsoever and mischaracterize some of the positions of this Court. These "errors" are addressed below in the order presented in counsel's Concise Statement.

### A. **The Trial Court's Reasons are not Discernable from the Record.**

This Court is not sure how it could have been any clearer on the record the reasons for dismissing this case. The Court believes Plaintiff is alluding to the coordinate jurisdiction doctrine when counsel states "Defendants unsuccessfully presented similar or identical motions previously. There is simply no basis for the trial court to deviate from the previous rulings." (Concise Statement at P.2) Plaintiff's counsel seems to believe that because she surmounted summary judgement this automatically makes her evidence

17

admissible. This is simply not the case. This simply means there is a disputed issue of material fact – how that fact is proven to a jury is an entirely different matter.

At the time of the hearing the Court addressed the concurrent jurisdiction doctrine. (MILT at P.27, L.17 – P.31, L.1). The Court addressed this concept because Plaintiff's counsel in argument and filings contended the denial of Defendant's summary judgment motions by another member of this Court precluded this member of the Court from granting Defendant's motions in limine. This Court does not believe the concurrent jurisdiction doctrine is applicable. However, if it applicable this Court finds it would be a manifest injustice to not have granted Defendant's motions in limine and proceed with a jury trial that ultimately would be futile.

## B. The Trial Court Considered Inappropriate Matters in Dismissing this Case

Plaintiff's counsel has the temerity to suggest this Court dismissed this action merely out of concerns regarding the COVID pandemic. This is totally, unequivocally, and completely misleading, if not outright false. This Court expressed to counsel that it would not empanel and thereby risk the lives of jurors in a case where it was CLEAR the case would have to be dismissed halfway through because Plaintiff would be unable to proffer a suitable expert to opine on the care including the use of the seizure medication Dilantin:

> Likewise, if that theory is taken to its logical extreme, the mere fact that you prevailed at summary judgment does not mean that I am bound by Judge Klein's decision in this situation of motions in limine simply because we are ready to put 12, 14, or 16 citizens of the Commonwealth of Pennsylvania in a jury box. We are going to subject them to potential exposure of COVID of which we are going to take all precautions, we are going to mask and we are going to distance, but I am not going to have a jury picked and wait until your experts testify when the Court, if the Court believes as a matter of law it has to grant these motions in limine, and I don't believe that the Concurrent Jurisdiction Doctrine applies.

18

(MILT, P.30 L.8-24).

This Court takes judicial notice of the Order entered by President Judge Kim Berkeley-Clark suspending jury trials in Allegheny County from January 6 through January 31, 2022. Plaintiff seems to suggest this Court should waste time, money, and resources to engage in some kind of performative theatre to please counsel. What is more aggravating to this member of the Court is that on February 9, 2022, in the case of *Englert v. Liberty Mutual Insurance,* GD 16-7248 this Court presided over a three-day jury trial. This Court was prepared to preside over a jury in Plaintiff's case had Plaintiff's counsel complied with the law.

## C. <u>**The Trial Court Improperly Convened a Conciliation Conference**</u>

Over this Court's now forty-one-year career in the law has this Court seen a situation where a Court cannot attempt to conciliate a matter merely because one party does not want to do so. It is fully within the Court's discretion to direct or order a conciliation conference:

> **(a)** In any action at any time the court, sua sponte or on motion of any party, may direct the attorneys for the parties or any unrepresented party to appear for a conference to consider:
>
> > **(1)** The simplification of the issues;
> >
> > **(2)** The entry of a scheduling order;
> >
> > **(3)** The possibility of obtaining admissions of fact and of documents which will avoid unnecessary proof;
> >
> > **(4)** The limitation of the number of expert witnesses;
> >
> > *(5) <u>**Settlement and/or mediation of the case;**</u>*
> >
> > **(6)** Such other matters as may aid in the disposition of the action.

231 Pa. Code § 212.3(***<u>emphasis added</u>***).

19

In Plaintiff's Concise Statement of Errors Complained of on Appeal at subsection C, Plaintiff acknowledges there was an initial conciliation on May 5, 2020, and the second conciliation was on February 2, 2022. (ECR# 188) There is no dispute this member of the Court presided over both conciliations. There is also no dispute the Court raised the issue Plaintiff did not have a physician expert(s).

The certificates of merit filed by Plaintiff's counsel are extremely telling. The initial Complaint filed on October 5, 2017, had five certificates of merit dated September 10, 2017, that checked the first two boxes on all five certificates. (ECR #10). On all five certificates the third box was not checked which states: "expert testimony of an appropriate licensed professional is unnecessary for the prosecution of this claim against this defendant." After the conciliation of May 5, 2020, when Plaintiff's counsel was informed of the problems with her expert witnesses, an Amended Complaint and a Second Amended Complaint were filed. On July 15, 2020, the Amended Complaint contained five certificates of merit dated July 15, 2020. (ECR #94). All five certificates now had the third box checked, "expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim against this defendant." *Id.* Likewise, the Second Amended Complaint filed on August 13, 2020, had identical certificates of merit with the identical boxes checked as the in the Amended Complaint. (ECR #114). It is clear Plaintiff's counsel hoped to convince a court an expert physician/doctor was not required. Even when warned of these problems, Plaintiff's counsel adamantly refused to obtain an appropriate physician expert(s).

### D. <u>The Court's Decision is not Supported by the Evidence.</u>

20

**E.  The Trial Court Committed an Error of Law and an Abuse of Discretion by disqualifying Plaintiff's Expert.**

This Court would simply reiterate its position as laid out in the sections above.

Conclusion

For twenty-two years this member of the Court was a plaintiff's medical malpractice attorney. It is humbly suggested that if one asks around the defense bar there would be no disagreement this jurist was a zealous advocate for plaintiffs. But when given the great honor of being elected to this bench this member of the Court took an oath to be fair, impartial, and to uphold the law. While I get no great pleasure out of dismissing a case without giving a plaintiff their day in court, I must follow the law as is my duty.

Respectfully Submitted,

_____, J.
Hon. Philip A. Ignelzi

_July 26, 2022_____
Date

21