J-A03038-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MITCHELL LAZORKA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| UPMC BEDFORD D/B/A UPMC | : | No. 1509 WDA 2021 |
| BEDFORD MEMORIAL AND UPMC, | : | |
| INC. | : | |

Appeal from the Judgment Entered December 15, 2021
In the Court of Common Pleas of Bedford County Civil Division at No(s):
2017-00753

BEFORE:  BOWES, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: April 25, 2024**

Mitchell Lazorka (Appellant) appeals from the judgment entered following the jury's verdict against him, and in favor of defendants UPMC Bedford d/b/a UPMC Bedford Memorial (UPMC Bedford) and UPMC, Inc. (collectively, UPMC), in this medical negligence action.  Upon careful consideration, we reverse and remand for a new trial.

On May 8, 2015, Appellant sustained a head injury after falling off of his skateboard.  The next day, because of a persistent headache, nausea, and vomiting, Appellant sought treatment at Temple University Hospital's (Temple) emergency department.  While there, a CT scan revealed Appellant suffered a brain injury, *i.e.*, "multicompartmental hemorrhagic parenchymal contusions, as well as subdural and subarachnoid blood collections."

Complaint, 10/26/17, ¶ 9. Appellant was admitted to Temple. A repeat CT scan disclosed no acute changes in Appellant's cerebral brain pattern. Appellant was discharged on May 11, 2015.

The evening of May 15, 2015, Appellant experienced changes in his mental status, exhibiting slurred speech and confusion. The next day, early in the afternoon, Appellant went to the emergency department at UPMC Bedford. Mohammed Arshad, M.D., treated Appellant. Appellant underwent a CT scan; Dr. Arshad commented that the images "appeared much better than before[.]" *Id.* ¶ 22. UPMC Bedford discharged Appellant that same day, at approximately 4:00 p.m.

The late morning of May 17, 2015, Appellant's condition worsened. He displayed difficulty walking, trouble with coordinated hand movements, and garbled speech. Appellant's parent took him to UPMC Altoona. An MRI disclosed Appellant had an

> acute [cerebral vascular accident (CVA),] probably 24-36 hours onset. CVA possibly due to vasospasm post trauma. In other words, [Appellant] was experiencing the stroke at the time he was seen by Dr. Arshad and the Hospital staff at UPMC Bedford the previous day.

*Id.* ¶¶ 33-34 (paragraph numeral omitted). Appellant was life-flighted to UPMC Presbyterian Hospital for treatment for a stroke. Appellant sustained permanent neurological damage.

On October 26, 2017, Appellant filed the instant medical negligence action against UPMC, based on the actions of its doctors and personnel.

Appellant claimed that UPMC Bedford's failure to diagnose and treat his ongoing stroke caused him

> [s]evere physical injuries, mental injuries, pain, suffering, mental anguish, humiliation, loss of the capacity for the enjoyment of life, and loss of earning capacity.

*Id.* ¶ 45; *see also id.* ¶ 55 (same). Appellant sought damages, as well as costs, exemplary damages, and any other relief deemed appropriate by the trial court. *Id.* (prayer for relief).

UPMC subsequently answered Appellant's complaint. Additionally, UPMC claimed in new matter that Appellant had a preexisting condition that caused or contributed to his injury; Appellant failed to mitigate; and the damages were the result of superseding or intervening causes. UPMC New Matter, ¶¶ 57-60.

Following the close of discovery and pre-trial motions *in limine*, the matter proceeded to trial in November 2021. On November 17, 2021, a jury rendered a verdict against Appellant and in favor of UPMC. Specifically, the jury found the conduct of Nurse Melissa Phillips and UPMC Bedford did not fall below the standard of care. The jury found Dr. Arshad violated the standard of care, but this negligence did not cause Appellant's injuries. Appellant filed a motion for post-trial relief, which the trial court denied. Thereafter, Appellant filed the instant timely appeal. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues:

- 3 -

1. Did the trial court abuse its discretion in erroneously limiting the expert testimony of Michael McCue, Ph.D.?

2. Did the trial court abuse its discretion when it erroneously admitted testimony pertaining to [Appellant's] alleged chronic use of alcohol or [m]arijuana?

3. Did the trial court commit an error of law or abuse its discretion when it erroneously precluded Nancy Futrell, M.D.'s rebuttal testimony?

Appellant's Brief at 6 (issues renumbered).

Appellant challenges the trial court's denial of a new trial based upon allegedly improper evidentiary rulings. Our standard of review over a trial court's decision to grant or deny a new trial is whether the trial court abused its discretion. *Steltz v. Meyers*, 265 A.3d 335, 344 (Pa. 2021). Appellant first argues that the trial court improperly limited the testimony of his neuropsychology expert, Michael McCue, Ph.D. *Id.* at 17. Appellant asserts,

> [w]hile Dr. McCue was literally on the witness stand, and despite earlier overruling a pre-trial objection related to his anticipated testimony, the trial [c]ourt ruled that Dr. McCue, a neuropsychologist with nearly forty years of experience assessing and treating patients with cognitive disorders, including stroke, was not qualified to offer opinions or conclusions relating to [Appellant's] cognitive and mental disabilities from (*i.e.* damages) from the stroke at issue….

*Id.* at 17-18. Appellant compares the proposed testimony of Dr. McCue to that deemed admissible in *McClain v. Welker*, 761 A.2d 155 (Pa. Super. 2000). Appellant's Brief at 19. Appellant claims that in *McClain*, this Court "specifically rejected the argument advanced by [UPMC Bedford] that the expert could not render such opinions because he did not hold a medical

- 4 -

degree – the same basis for [UPMC Bedford's] objection, and the trial court's ruling[.]" *Id.* (emphasis omitted).

Appellant relies on the "long-standing principle" that "the standard for qualification of an expert witness is a liberal one[.]" *Id.* (citing *Miller v. Brass Rail Tavern*, 664 A.2d 525 (Pa. 1995)). According to Appellant, Dr. McCue should have been permitted to testify that Appellant's damages resulted from a stroke, because Dr. McCue's "primary areas of research throughout his career were the assessment and rehabilitation of individuals with cognitive disorders, and the rehabilitation of stroke patients." Appellant's Brief at 24 (emphasis omitted). Appellant details Dr. McCue's education and lengthy experience in neuropsychology. *See id.* at 23-25. According to Appellant, Dr. McCue's profession "involves assessing cognitive functions that are secondary to brain impairments[,] such as strokes." *Id.* at 26 (internal quotation marks omitted). In particular, Dr. McCue "did research regarding, and worked directly with, stroke patients." *Id.*

At trial, Appellant informed the trial court that Dr. McCue would testify only regarding damages. *Id.* at 28-29. Appellant directs our attention to the following argument he presented at trial:

> [Appellant's counsel]: [Dr. McCue is] a damages witness, your honor…. But he has to be allowed to say that my evaluation indicated that [Appellant] was suffering from a stroke. … He's going to say [Appellant's] symptoms were consistent with a stroke.
>
> THE COURT: Didn't you say in response to the motions *in limine* and from McCue [*sic*] that he is a damages witness?

- 5 -

[Appellant's counsel]: Yes.

THE COURT: Okay. So why aren't you limiting it to damages then?

[Appellant's counsel]: Because … the assessments that he's doing on this patient, the findings he's making are consistent with someone who suffered a stroke. That's what he's going to say.

… All of his testimony is related to the … the current and future issues [Appellant] had which[,] in [Dr. McCue's] opinion[,] are stroke-related. And he's treated patients for years that have suffered stroke that have stroke symptoms consistent with [Appellant's].

Appellant's Brief at 29 (citations omitted). Appellant claims that notwithstanding this explanation, the trial court improperly disallowed Dr. McCue to opine "to a reasonable degree of professional neuropsychological certainty," whether Appellant "suffers from any cognitive impairments related to [his] stroke that occurred in May of 2015[.]" *Id.* at 30 (citations omitted).

According to Appellant, this error "was hugely damaging, insofar as Jurors were not permitted to hear Dr. McCue's answer to [Appellant's] counsel's question: Were these permanent neurological deficits related to [Appellant's] stroke?" *Id.* at 31. According to Appellant, jurors were thus "left to speculate about the cause of [Appellant's] neurological impairments." *Id.*

Appellant acknowledges Dr. McCue testified "at length regarding [Appellant's] impairments[.]" *Id.* at 32. However, Appellant contends that,

because of the trial court's erroneous ruling, Dr. McCue's testimony was given in a vacuum – the jury had no basis to link

- 6 -

[Appellant's] severe cognitive impairments to the stroke that UPMC Bedford's [Emergency Department's] provider failed to recognize. Worse, by virtue of the ruling, [Appellant's counsel] could not ask Dr. McCue if [Appellant's] cognitive disabilities were related to anything else other than his stroke….

*Id.* at 34. Appellant asserts that UPMC exploited the lack of this testimony during cross-examination. *Id.* According to Appellant, UPMC's counsel "attempted to establish that [Appellant's] cognitive impairments may have been caused by a traumatic brain injury, or some other event that pre-dated his stroke." *Id.*

In addressing Appellant's issue, we first observe that

[i]n order to state a cause of action for negligence, a plaintiff must allege facts which prove the breach of a legally recognized duty or obligation of the defendant that is causally related to actual damages suffered by the plaintiff. To prove the elements of a duty and the breach thereof, a plaintiff must show that the defendant's act or omission fell below the standard of care, and, therefore, increased the risk of harm to the plaintiff. The plaintiff then must demonstrate the causal connection between the breach of a duty of care and the harm alleged: that the increased risk was a substantial factor in bringing about the resultant harm.

*Green v. Pa. Hosp.*, 123 A.3d 310, 315-16 (Pa. 2015) (citations and quotation marks omitted).

"The admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion." *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003); *accord Buttaccio v. Am. Premier Underwriters*, 175 A.3d 311, 315 (Pa. Super. 2017).

"Generally, relevant evidence is admissible and irrelevant evidence is inadmissible." ***Mitchell v. Shikora***, 209 A.3d 307, 314 (Pa. 2019).

> Evidence is relevant if it has "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Pa.R.E. 401. The threshold for relevance is low given the liberal "*any* tendency" prerequisite. ***Id.*** (emphasis added). Relevant evidence "is admissible, except as otherwise provided by law." Pa.R.E. 402. One such exception is that relevant evidence may be excluded "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

***Id.***

Section 512 of the Medical Care Availability and Reduction of Error Act (MCARE Act), 40 P.S. § 1303.512, governs the qualifications required of an expert testifying in a medical malpractice action against a physician:

> **(a) General rule**.—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony **and fulfills the additional qualifications set forth in this section as applicable**.
>
> **(b) Medical testimony**.—An expert testifying on a medical matter, including the standard of care, risks and alternatives, **causation and the nature and extent of the injury**, must meet the following qualifications:
>
> > (1) **Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia**.
> >
> > (2) Be engaged in or retired within the previous five years from active clinical practice or teaching. Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court

- 8 -

determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training, or experience.

**(c) Standard of care**.—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

\* \* \*

**(e) Otherwise adequate training, experience and knowledge**.—**A court may waive the same specialty and board certification requirements** for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512 (emphasis added).

We further recognize,

[r]egardless of the requirements for expert witnesses in medical malpractice actions against physicians under the MCARE Act, … the MCARE Act does not mandate the admission of a given expert's testimony. Rather, **decisions regarding the admission of expert testimony are left to the trial court's discretion, and will not be disturbed absent an abuse of discretion....**

*Green*, 123 A.3d at 325 (emphasis added). The trial court may exclude an expert's testimony if its probative value is outweighed by the potential for undue prejudice or confusion. *Id.*

Appellant relies on *McClain* to support the admission of Dr. McCue's testimony. However, *McClain* involved a negligence action against the owners of a rental unit, not a medical negligence action against physicians. *McClain*, 761 A.2d at 156. As our Supreme Court subsequently explained in *Freed v. Geisinger Med. Ctr.*, 971 A.2d 1202 (Pa. 2009):

> In *McClain*, the parents of two minor children filed a negligence action **against their landlords**, alleging the children suffered toxic lead poisoning as a result of ingesting lead[-]based paint from their rental home. The landlords filed a motion *in limine* to preclude the parents' expert, a scientist who had a Ph.D., but was not a medical doctor, from testifying as to the causal relationship between ingestion of lead and cognitive defects. Purportedly relying on [*Flanagan v. Labe*, 690 A.2d 183 (Pa. 1997)], "for the proposition that only medical doctors could testify as to causation," 761 A.2d at 157, the trial court concluded that because the scientist did not have a medical degree, he was not qualified to testify as to medical causation, and granted the landlords' motion *in limine*. Thereafter, the trial court granted the landlords' motion for a compulsory nonsuit.
>
> The Superior Court reversed on appeal, finding the trial court's reliance on *Flanagan* misplaced, in that, unlike the parents' proffered expert, "the nurse in *Flanagan* never asserted that she had any pretension to specialized knowledge related to medical causation." *McClain*, 761 A.2d at 157. Concluding that the scientist, … "'possesse[d] more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience,' in his specialized fields of study," the *McClain* Court held the scientist should have been permitted to render an expert opinion "within the guise of Pa.R.E. 702 as to the causation of cognitive disorders." *Id.* at 157-58.

- 10 -

***Freed***, 971 A.2d 1202, 1207-08 (emphasis added). Although our Supreme

Court distinguished ***Flanagan***, it stated,

> the MCARE Act, by its terms, appears to apply **only to medical professional liability actions against physicians**, and not to other professional liability actions, or to actions against nonphysician health care providers….

***Id.*** at 1212 n.8 (emphasis added).

Similarly, in ***Green***, our Supreme Court affirmed a trial court's

preclusion of a nurse's expert testimony under Section 512:

> [B]ecause this was a medical professional liability action[] against a physician and [the proposed expert nurse] did not possess an unrestricted physician's license, [the nurse] was properly precluded [from offering causation testimony] under the MCARE Act's requirements under § 1303.512(b)(1). If this had been a case, such as ***Freed***, involving the causation of bedsores and whether poor nursing was a (*sic*) the cause of the bedsores[,] [the nurse] would have been free [to] testify as an expert as to causation. However, since it involved liability against multiple physicians and nurses, it would have created an anomalous result to allow [the expert nurse] to testify as to causation as to the nurses, but claim he was incompetent to testify against the physicians for care that was in many places indivisible as to who was providing it. As this was the case, the [nurse] was properly allowed to testify regarding his expert opinion of the quality of care provided by the Defendant nurses **but not as to causation** of Decedent's death.

***Green***, 123 A.3d at 323 (emphasis added; citation omitted). With this in

mind, we review the proposed testimony of Dr. McCue.

At trial, Appellant's counsel asked Dr. McCue,

> [C]an you tell us to a reasonable degree of professional neuropsychological and rehabilitative certainty if you concluded that [Appellant] suffers from any cognitive impairments related to a stroke that occurred in May of 2015?

N.T., 11/12/21, at 63. UPMC's counsel objected, arguing that Dr. McCue was not permitted to testify as to causation:

> [T]his witness could testify as to his observations and that would be the damages testimony. But to take it one step further then ties his observations to an injury and that is causation.

*Id.* at 66. The trial court ultimately permitted Dr. McCue to testify regarding damages, but not causation:

> THE COURT: I have no problem [if] you ask [Dr. McCue:]
>
> Doctor, based on what you know[,] that [Appellant] suffered a stroke. And then you ask him any other question. That's fine.
>
> I just don't think [Dr. McCue] can say … these are the damages. These are the injuries and they are consistent [with] occurring from a stroke. Because now he's bleeding into a medical diagnosis that needs to be made by [Appellant's medical expert].
>
> ….
>
> [UPMC's Counsel:] … Can ask I him then. In accordance with your ruling, Judge, is it your understanding that [Appellant] suffered a stroke?
>
> THE COURT: Oh, yeah.

N.T., 11/12/21, at 75-77. The trial court expressly limited Dr. McCue's testimony to damages:

> ATTORNEY GIGLIONE: He can say that the tests showed injuries consistent with a certain part of the brain. I don't see why he can't. That's what he does for a living. I mean he's a neuro-psychologist.
>
> THE COURT: I think [Dr. McCue] can make … that link. **But he's not saying what caused that damage.** … [B]ecause if you just drop someone with cognitive disabilities in front of him, and he has no idea what they're from, he can't tell you what caused it necessarily. Although, [you argue] he would be able to link that. I don't think he can. But he could say what part of the brain that

that person is limited from.  I think he can testify to that.  Okay?

***Id.*** at 94-95.

As the trial court explained in its opinion,

[Appellant] argues that we erred in prohibiting Dr. McCue from providing causation testimony.  However, as [Appellant] has conceded on several occasions (including his [Pa.R.A.P. 1925(b)] Concise Statement), **Dr. McCue was not offered as a causation expert, but solely as a damages expert.**

[Appellant] also argues that we precluded Dr. McCue from testifying about the damages related to the stroke.  We think such an argument is oversimplified.  While we did preclude Dr. McCue from testifying about the medical causes of the stroke damage (which were supplied by [Appellant's] expert, Dr. Futrell), **we did permit him to testify about [Appellant's] cognitive impairments and how those cognitive impairments relate to corresponding areas of the brain.**  In short, we did not permit Dr. McCue, a neuropsychologist damages expert, to testify about the medical causation of [Appellant's] stroke.  Rather, we believe we correctly limited Dr. McCue's testimony to the cognitive damages sustained by [Appellant], while also permitting Dr. McCue to link said cognitive impairments to the physical areas of the brain according to his expertise.  Therefore, we believe our ruling properly framed the experts' respective fields and did not deprive [Appellant] of effectively conveying [his] theory of the case to the jury.

Trial Court Opinion, 6/1/22, at 2-3 (emphasis added).

Our review confirms Appellant presented Dr. McCue as a damages expert.  Although 40 P.S. § 1303.512(e) permits a trial court to waive the medical license requirement, it is reserved to the trial court's discretion.  ***See Green***, 123 A.3d at 325.  Under the circumstances presented, we discern no abuse of the trial court's discretion in limiting Dr. McCue's testimony to damages, as Appellant presented expert causation testimony through Dr.

- 13 -

Futrell. *See id.*; *Buttaccio*, 175 A.3d at 315 ("The admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion."). Accordingly, Appellant's first issue merits no relief.

In his second issue, Appellant argues the trial court improperly admitted prejudicial and inflammatory character evidence, including testimony regarding his "alleged chronic use of alcohol or marijuana[.]" Appellant's Brief at 55. Appellant states he sought to preclude this testimony through a pre-trial motion *in limine*. *Id.* at 57. According to Appellant, the report of UPMC's expert, James M. Gebel, M.D. (Dr. Gebel), falsely opined that Appellant had abused benzodiazepine, fathered a child out of wedlock, and included additional evidence impugning his character. *Id.* at 58. Appellant explains,

> [Appellant's] head injury and subsequent stroke occurred in May 2015. Around a year later, in 2016, [Appellant], at age 26, sought treatment for alcohol and had abstained from any alcohol consumption since that time—over 5 years at the time of trial. [UPMC] presented no expert to testify that [Appellant's] brief use of alcohol would have any impact on his life expectancy….

*Id.* Appellant contends that evidence regarding his driving under the influence conviction, or a charge of public intoxication, had no probative value when weighed against its prejudice. *Id.* at 58-59.

Appellant further challenges Dr. Gebel's testimony that Appellant's refusal to provide urine when requested at UPMC Bedford was consistent with illicit drug use. *Id.* at 59. According to Appellant, there was no "well-established history" that Appellant had been abusing illegal narcotics or that

- 14 -

UPMC Bedford had such knowledge. *Id.* Finally, Appellant argues there is no evidence of "chronic" drug use. *Id.*

Appellant distinguishes the circumstances in this case from those presented in *Kraus v. Taylor*, 710 A2d 1142 (Pa. Super. 1998), *overruled in part by Coughlin v. Massaquoi*, 170 A.3d 399, 406 (Pa. 2017)), which we discuss *infra*. Appellant's Brief at 60. Appellant claims that unlike in *Kraus*,

> there was no evidence [Appellant's] brief alcohol consumption impacted his life expectancy, no expert to testify that [Appellant's] brief alcohol consumption impacted his life expectancy and only speculation that the absence or the refusal of a urine test was evidence of chronic drug abuse. Therefore, there was no "highly" probative value to this "highly" prejudicial evidence….

*Id.* at 61.

> Appellant acknowledges, however, that

> many of [Dr.] Gebel's inflammatory opinions were not mentioned by [him] at trial; however, because the trial court placed no limitations on [Dr.] Gebel's trial testimony, [Appellant's] counsel was required to get ahead of the opinions through [his] own witnesses—even discussing alcohol and marijuana with them….

*Id.* at 61-62 n.73.[1]

Appellant asserts this inflammatory evidence "so poisoned the jury, that [he] was unable to get a fair trial." *Id.* at 63. Appellant directs our attention to statements in UPMC's opening statement regarding Appellant's smoking

---

[1] Appellant acknowledges much of the evidence regarding his drug and alcohol history was presented by his own witnesses. Appellant's Brief at 65-67.

- 15 -

from the age of 16, his drinking, his DUI conviction, and his subsequent public intoxication arrest. *Id.* Appellant points out UPMC repeated these disparaging comments during its closing. *Id.* at 65. Appellant asserts this evidence was irrelevant, inflammatory, and should have been precluded. *See id.*

In *Kraus*, this Court held a plaintiff had implicitly waived confidentiality protections for drug and alcohol treatment records by filing a personal injury lawsuit seeking damages for permanent injury:

> Such a claim requires the jury to evaluate the claimant's life expectancy. Evidence of [plaintiff's] chronic drug and alcohol abuse strongly suggests that his life expectancy deviates from the average. Accordingly, the evidence of [plaintiff's] drug abuse tended to establish a material fact and was therefore relevant. Moreover, actuarial tables were submitted to the jury, at [plaintiff's] request, to help them evaluate his life expectancy. When such tables are submitted in a personal injury case, the jury must be permitted to consider individual characteristics that impact on the injured party's life expectancy.

*Kraus*, 710 A.2d at 1143-44 (internal citation omitted). The Court reasoned,

> [a]llowing [the plaintiff] to pursue a claim for permanent injury, while simultaneously barring [the defendants] from access to [the plaintiff]'s long history of drug and alcohol abuse, would be manifestly unfair and grossly prejudicial. We cannot believe that the Pennsylvania General Assembly intended to allow a plaintiff to file a lawsuit and then deny a defendant relevant evidence, at plaintiff's ready disposal, which mitigates defendant's liability. Rather[,] the General Assembly must have intended the privileges to yield before the state's compelling interest in seeing that truth is ascertained in legal proceedings and fairness in the adversary process.

*Id.* at 1145 (citations and quotation marks omitted).

At trial, UPMC expert Arthur Pancioli, M.D., testified regarding Dr. Ashad's request for a urine drug screen from Appellant :

[P]robably the number one reason that you find abnormalities. I mean the Number 1 thing that fakes you out on an NIH scale is some sort of intoxication;, right? Or … use of drugs or alcohol. I mean that, you can imagine how speech would be altered, coordination would be altered, [] commands would be altered. So, tragically there's a lot of drug abuse in America. And in you persons that's when we see altered mental status in young people in the emergency department. That is standard practice.

N.T., 11/16/21, at 70-71. Dr. Pancioli disagree with the opinions of UPMC's experts that a drug screen was irrelevant to the standard of care:

A young person who is not acting right, … there's a concern drug and alcohol may be involved, it's going to help my thinking to know if that's part of it and the drug test would tell me that. So I don't think it's fair to say well you can just rule out one of the most common things.

*Id.* at 72.

Instantly, the trial court addressed Appellant's claim and concluded it lacks merit:

First, [the court] question[s] [Appellant's] assertion that the jury would find [Appellant] to be a "ne'er-do-well" simply due to his use of alcohol and marijuana as a young adult. *See* [Appellant's] Motion for Post-Trial Relief, ¶ 17. Alcohol use, by itself, is not evidence of bad character contemplated by Pa.R.E. 404(b), nor is it prejudicial. In [the court's] view, [UPMC] did not argue to the jury that [Appellant] was a person of bad character due to his use of alcohol and/or marijuana. Moreover, [the court] found that the probative value of such evidence clearly outweighed any prejudicial effect. Despite [Appellant's] contention that his alcohol/marijuana usage was not linked to any claim, such personal history would have been clearly relevant to damages had the jury's verdict progressed that far. [Appellant's] request for millions of dollars in damages for past and future non-economic loss inherently brings into play [Appellant's] health and physical condition prior to the injury, as well as [Appellant's] life expectancy. Indeed, such considerations are a part of the standard jury instructions for past and future non-economic loss.

Trial Court Opinion, 6/1/22, at 5 (footnotes and quotation marks omitted).

We discern no abuse of discretion in the trial court's admission of this evidence. *See Mitchell*, 209 A.3d at 314 ("An abuse of discretion occurs where the trial court reaches a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or is the result of partiality, prejudice, bias, or ill will." (citation and quotation marks omitted)). Accordingly, Appellant's second issue warrants no relief.

In his third and final issue, Appellant argues that the trial court improperly precluded his expert, Dr. Futrell, from rebutting the testimony of UPMC's expert, Dr. Gebel. Appellant's Brief at 37. Appellant claims that UPMC's expert presented a new medical theory regarding the cause(s) of Appellant's brain injuries, *i.e.*, that Appellant had suffered "two separate cerebrovascular events." *Id.* (capitalization modified). Appellant explains that pre-trial, the parties disputed whether Appellant's stroke

> continued to evolve as of the date of the UPMC Bedford visit, *i.e.*, Dr. Futrell's position, or, as [UPMC's expert, Dr. Gebel] admitted in his report, that the stroke had been completed before the visit.
>
> During [Dr.] Gebel's testimony, however, he changed the evidentiary landscape. For the first time, the dispute changed to whether there was one evolving stroke, or two separate cerebrovascular events.

*Id.* (footnotes omitted).

Appellant explains that during her testimony, Dr. Futrell identified the area of Appellant's brain that exhibited the breakdown of blood products. *Id.* at 38. Dr. Futrell opined to a reasonable degree of medical certainty that

Appellant's stroke was not completed when he presented at UPMC Bedford. *Id.* Appellant claims Dr. Gebel disputed this issue in his report, opining that the area represented swelling. *Id.* (footnote omitted). There was no mention of a second event in Dr. Gebel's report. *Id.* at 40. Appellant argues, because Dr. Gebel was permitted to testify about a second cerebrovascular event, the trial court erred in precluding Dr. Futrell from testifying regarding this matter on rebuttal. *Id.* at 46.

Appellant contends the preclusion of Dr. Futrell's rebuttal on the two-event theory was "improper as a matter of right and not subject to the trial court's discretionary exclusion." *Id.* at 48 (capitalization modified). Appellant argues,

> [f]or matters not evidential until the rebuttal, the proponent has a right to put them in at that time, and they are therefore not subject to the discretionary exclusion of the trial court.

*Id.* at 49 (quoting *Schoen v. Elsasser*, 172 A. 301, 302 (Pa. 1934)).

Appellant compares the circumstances in this case to those presented in *McNair v. Weikers*, 446 A.2d 905 (Pa. Super. 1982). In *McNair*, Appellant asserts, this Court upheld the award of a new trial based upon the preclusion of rebuttal testimony:

> A litigant has the privilege of offering rebuttal testimony, and where the evidence proposed goes to the impeachment of the testimony of his opponent's witnesses, it is admissible as a matter of right. Rebuttal is proper where facts discrediting the proponent's witnesses have been offered. Wigmore on Evidence (2d Ed.) vol. 4, p. 20 § 1873. "For matters properly not evidential until the rebuttal, the proponent has a right to put them in at that

- 19 -

time, and they are therefore not subject to the discretionary exclusion of the trial court." **Id.**, p. 25, § 1873.

Appellant's Brief at 50 (quoting **McNair**, 446 A.2d at 908 (citation omitted)).

This Court has recognized,

Generally the admission of rebuttal evidence is a matter within the sound discretion of the trial court. Rebuttal evidence is proper where it is offered to discredit testimony of an opponent's witness. Our Supreme Court has previously opined[,] "where the evidence goes to the impeachment of his opponent's witness, it is admissible as a matter of right." Furthermore, in order to constitute proper impeachment evidence, the rebuttal witness' version of the facts must differ from that of the witness being impeached.

**Am. Future Sys. V. Better Bus. Bureau**, 872 A.2d 1202, 1213 (Pa. Super. 2005) (quoting **Ratti v. Wheeling Pittsburgh Steel Corp.**, 758 A.2d 695, 708-09 (Pa. Super. 2000)).

Our review of the testimony discloses the following. At trial, Dr. Futrell testified regarding the differences between a subarachnoid hemorrhage and a stroke. N.T., 1/10/21, at 166-67. She explained

[A] hemorrhage … goes on the surface on the brain and around the spaces where the spinal fluid goes. And the spinal fluid sort of bath[e]s the brain. And subarachnoid hemorrhage is when, what gets into that space, and it most commonly comes from a ruptured aneurysm. But it can be spontaneous, and it also can come from head trauma.

….

A stroke is a set of neurologic symptoms that comes when a focal area of brain does not get blood either because there's a hemorrhage there, or a blood clot blocking it. And by focal we mean that it's something that has to be in one part of the brain not something [] affecting the whole brain[,] which would be called global. So focal and global.

*Id.* at 166-67.

Dr. Futrell further described two types of strokes. A hemorrhagic stroke occurs "when a blood vessel bleeds, and the tissue bleeds. And there's a pocket of blood, …[i]nside the brain." *Id.* at 167. An ischemic stroke occurs "when there is an inadequate amount of blood going to the brain. And that's usually when a blood clot blocks a blood vessel to the brain." *Id.* Dr. Futrell identified "vasospasm" as a type of ischemic stroke "where the blood vessel narrows down and … not enough blood can get through." *Id.* at 168. According to Dr. Futrell, the symptoms of a stroke are the same, whether the stroke is caused by a clot or a vasospasm. *Id.* at 170. She stated, "It's the area of the brain that isn't working that gives the symptoms." *Id.*

Dr. Futrell also testified regarding the differences between a completed stroke, an evolving stroke, and a vasospasm:

> So, it takes a period of time for tissue to die when it doesn't get blood. And in the brain tissue will work for about 3 minutes without blood, and then it begins to stop working. Now if there's absolutely no blood it stops working faster. If there's some blood still going through, but a reduced amount, pretty soon a person will get symptoms but the tissue won't die.
>
> So, an evolving stroke is where tissue is starting to have a dysfunction. And it can progress to more and more damage. Once the tissue is dead, that's considered a completed stroke. In an evolving stroke, you have the possibility of getting blood flow back in there and saving some tissue. In a completed stroke it's a done deal. The tissue is gone.

*Id.* at 171. Dr. Futrell opined that when Appellant presented to UPMC Bedford, "[h]e was having stroke symptoms, **and tissue changes were evolving**." *Id.* at 175 (emphasis added).

Over UPMC's objection, Dr. Futrell was permitted to rebut Dr. Gebel's expert report, even though he had not yet testified. ***See id.*** at 184-85 (wherein UPMC's counsel objects to Dr. Futrell's testimony concerning Dr. Gebel's anticipated testimony). Dr. Futrell disagreed with Dr. Gebel's opinion that the CT scan taken by UPMC Bedford depicted a completed stroke. *Id.* at 189-90. Dr. Futrell opined that the CT scan can "rule out a completed stroke. But they don't rule out an ischemic stroke that is evolving." *Id.* at 191. She explained,

> [i]f there were a completed stroke the area of the completed stroke would all be dark. And we could put, I could put a line around it and show it to you. But you can see that the area was not darker on the right side of his brain than the corresponding tissue on the left. Therefore, there was not a completed stroke.

*Id.* at 191-92. She reiterated, UPMC Bedford's records did not rule out "an ongoing early ischemic stroke." *Id.* at 192.

Dr. Futrell further testified as follows:

[Appellant's Counsel:] … I would like you to take a look, again, if we could [at] the Exhibit 15, … [a]nd that's the CT scan. So here we are, again at UPMC Bedford. And we're talking about something called a vasospasm in the right middle cerebral artery. Can you show our jurors on this CT scan [] what area of the middle cerebral artery would be severed. And would be seen on this CT scan?

J-A03038-24

[Dr. Futrell:] Well, the middle cerebral artery territory would be approximately here and here and here, (indicating), on this particular scan.

Q. And do we see a completed stroke here?

A. Absolutely not.

Q. Doctor, getting back to the vasospasm and the treatment. Is there treatment for vasospasm?

A. Yes.

Q. And what is that treatment?

A. It's two-fold. The first one is to try and force that vessel to stay open. And one does that by getting fluid into the vessel, giving … plenty of IV fluid. Making sure the tank is full to push that vessel open. And the other thing we do is … give medicines to cause the blood pressure to go up. And, again, that forces that vessel open.

….

Then the second line we take is the medicines that will prevent the vasospasm from occurring or will [] at least slow it down. And those are called calcium channel blockers. We use Nydopene [*sic*] which we can use oral or IV. We use Nifedipine which is IV. Or if a catheter is placed in we can put a medicine called Verapamil right into the vasospasm to decrease the vasospasm.

Q. And you reviewed … Dr. Gebel's report; correct?

A. Yes, I did.

Q. And he said that the stroke had been completed at this time. Do you agree with him or disagree?

A. I disagree.

Q. And why is that?

A. Well, I disagree. First of all because I can't see it on this CT scan. It would be here if it were completed. And, secondly, I

- 23 -

went back as he did and reviewed all the images under the whole, on the whole course. And then later images I could see the area where the stroke was. I can see that even then it was a completed stroke, and can show from the MRI's that, in fact, some tissue was saved.

Q. Doctor, before we get to that. I want to ask you another question related to the vasospasm versus clot. One of the other things that you had read in Dr. Gebel's report [was] that this couldn't have been predicted because it is not like a stroke because it doesn't happen immediately. And that is why this was not necessarily diagnosed as a stroke. Why is that opinion wrong?

A. Well, a stroke usually happens immediately because usually a blood clot goes to a vessel and stops the blood. But in the case of vasospasm since the flow is only reduced, the symptoms come on very gradually. And then as the vasospasm gets worse from those blood products, the symptoms will get worse. And when that happens 15 to 20 percent of the time there will be a stroke with vasospasm.

*Id.* at 198-200.

Dr. Futrell opined that when Appellant arrived at UPMC Bedford, he was very early in the stroke and still had salvageable brain tissue. *Id.* at 206. She confirmed UPMC Bedford's inaction increased Appellant's risk of harm. *Id.* According to Dr. Futrell, Appellant, *inter alia*, needed to be administered a calcium channel blocker to stop the vasospasm, but "[h]e got nothing. He was sent home." *Id.* at 206-07. She testified an MRI would have shown Appellant was having an ischemic stroke. *Id.* at 207.

By contrast, in his expert report, Dr. Gebel opined that UPMC Bedford's CT scan depicted

substantially more swelling in the right posterior and inferior portions of the right cerebral hemisphere than would be expected

- 24 -

given the overall reduction of swelling in [Appellant's] brain. Only with the benefit of post-hoc comparison of this CT scan to his subsequent 5/17/15 brain MRI and 5/18/15 CT scan of the brain …, in hindsight this edema represents evidence of ischemic injury to the right MCA posterior division due to the stroke he had been suffering from, in retrospect, since the prior evening of 5/15/15.

Gebel Expert Report at 8. Dr. Gebel opined that the CT scan taken by UPMC Altoona was consistent with a "24-36 hour old, long-completed, right middle cerebral artery posterior division of the right middle cerebral artery infarct." *Id.* at 9. According to Dr. Gebel's report, the CT performed by UPMC Presbyterian Hospital was "consistent with a completed subacute cerebral infarct of 24-36 hours age. It correlates well with the evidence of a completed infarction on the earlier UPMC Altoona brain MRI." *Id.* at 10.

Dr. Gebel additionally stated:

[Appellant] had already suffered a completed right middle cerebral artery posterior division stroke when he presented to the UPMC Bedford emergency department on 5/16/15. Multiple concordant lines of evidence substantiate this opinion as follows.

a.      Imaging evidence: With the benefit of hindsight and being able to do a post-hoc review of BOTH [Appellant's] preceding Temple University 5/9/15 and 5/10/15 non-contrast head CTS and his Subsequent 5/17/15 UPMC Altoona and UPMC Presbyterian neuroimaging studies, the fact that he had effacement of his R MCA posterior division sulci out of proportion to his other brain sulci as compared to what would have been expected if he only had had his expected evolution of cerebral contusions in isolation, proves he had either most likely already infarcted his right superior MCA division, or alternatively, more conservatively with virtual certainty had enough progression of ischemia that by the time he could have been hypothetically diagnosed with vasospasm and transferred to UPMC Presbyterian (or elsewhere) for vasospasm treatment, it would have been too late to save any of his R MCA posterior division territory.

*Id.* at 12-13.

Dr. Gebel opined, in part,

[F]rom a pragmatic viewpoint, even had Dr. Arshad somehow figured out that [Appellant] was having a stroke despite UPMC Bedford having no MRI scanner available on Saturdays, and transferred him promptly to UPMC Altoona, it in reality took UPMC Altoona nearly 5 hours to get a STAT brain MRI completed, then another 2 hours to STAT transfer [Appellant] to UPMC Presbyterian. It then took UPMC Presbyterian another 2.5 hours to actually diagnose and treat [Appellant's] vasospasm— and this all was under the most optimal circumstances where [the physician at UPMC Presbyterian] had an immediate suspicion of stroke.

*Id.* at 14 (capitalization modified).

At trial, Dr. Gebel testified that Appellant's stroke was "complete" when he presented to UPMC Bedford. N.T., 11/16/21, at 180. According to Dr. Gebel, "[t]here was no intra-ventional amenable to Dr. Arshad to treat [Appellant's] stroke." *Id.* Dr. Gebel explained that the stroke began on May 15th and was "very rare." *Id.* at 180, 188.

Dr. Gebel described the CT scan taken by Temple. *Id.* at 190. He pointed out to the jury the contusions, or bruises, in Appellant's brain depicted on the scans. *Id.* at 191. Dr. Gebel explained,

this is where we actually see the type of bleeding [Appellant] had. And it involves basically some front portions of the brain that are right above the nose. That's called the intra-rhinal cortex. It's responsible for taste, smell, and depending on how much gets damaged[,] memory.

We also see some bruising and bleeding in [Appellant's] temporal lobe. Here. This bright white stuff here and here. So, the front and middle parts of the temporal lobe. That is an area of the brain that's involved in memory [] called the hippocampus

- 26 -

in the memory center of the brain. So, we see bleeding and bruising of that structure. So, this would explain in clinical terms when one has, or what you expect to see at least for someone having an injury in these areas is memory problems, loss of taste, and loss of smell. Those would be the things you would expect by looking at the scan. And, in fact, those are all things that [Appellant] did, in fact, experience.

*Id.* at 191-92.

Dr. Gebel opined that when Appellant arrived at UPMC Bedford, the stroke was completed: "My opinion is that with the benefit of subsequent imaging and hindsight, **yes, it was a completed stroke when [Appellant] presented to UPMC Bedford for sure**." *Id.* at 180 (emphasis added). Dr. Gebel opined that when Appellant struck his head, it caused his brain to bleed:

[Appellant's] brain was hit. It ricocheted so hard into his skull that he didn't just bruise it. So if, you know, it [*sic*] hit yourself so hard, you know, you damage muscle and get hematoma (*sic*), bleeding. And you get a big, you know, welt, a big hick[e]y. In the same manner[, Appellant] actually had bleeding in his brain. So he hit his head so hard that the blood vessels were literally, mechanically torn apart and caused hemorrhaging into his brain.

….

[Appellant] not only had a subarachnoid hemorrhage, he also had what is called intra-prancimal hemorrhage. Which is, again, bleeding in the substance of the brain. And also what is called sub-dural hemorrhage, which is hemorrhage underneath the big, thick lining of the brain, as well as the subarachnoid hemorrhage, which is below that. So, he literally had 3 entire types of, or areas of bleeding in his brain, which again indicates a quite … serious head injury, not a simple concussion.

[UPMC's Counsel:] … Does the bleeding itself cause any deficits or permanent damage to a patient?

[Dr. Gebel:] Yes, sir. I mean obviously where the blood is it damages obviously the area of the brain that it's bleed [*sic*] into,

> you know, directly. … [A]nd then in this case that traumatic subarachnoid blood that was around the blood vessels ultimately, you know, caused this vasospasm. The squeezing of the blood vessels that led him to having a stroke that began on May the 15th.

*Id.* at 187-88.

Dr. Gebel testified that the symptoms Appellant displayed prior to the evening of May 15th were attributable to his traumatic brain injury. *Id.* at 202. Dr. Gebel opined that Appellant's condition changed the evening of May 15th. *Id.* at 201. According to Dr. Gebel, the new symptoms displayed by Appellant that evening, *i.e.*, "the trouble talking and trouble writing were, in … my opinion, due to the start of a stroke." *Id.* at 202; *see also id.* at 207 (describing how the CT scan indicated "[Appellant] had started to have a stroke that previous evening"). He explained,

> a stroke does not show up on a [CT] scan like this typically for about 24 hours. Because by the time it does, the brain is long dead, and is already long permanently damaged and past the point of no return with 100 percent … certainty. … [I]t is clearly in retrospect that [Appellant] was having a stroke when he was at UPMC Bedford that had begun that night before.

*Id.* at 207-08.

Dr. Gebel testified:

[Appellant] had a completed stroke when he got to UPMC Bedford.

> These new additional symptoms, again, with the benefit of looking back at the whole picture here as an expert[,] indicated he was starting to get additional vasospasm and additional lack of bloodflow to an even larger part of his brain. And that part of the brain … was trying to have a stroke.

It was in a state that is called a p[e]numbra. A p[e]numbra is a Greek word. It means shadow. And the p[e]numbra means when there is a sufficient lack of bloodflow and oxygen to a part of the brain that it stops functioning properly. But is not irreversibly dead. So, shaken but not stirred if you will. So, it means that part of the brain is in the process of dying or trying to die. Trying to become permanently damaged, but he has not quite yet gotten there….

So, again, if you believe Dr. Futrell's opinion that everything had started, … only at Altoona it would be relevant from that standpoint because then all of the subsequent … delay and time that transpired that would then allow that to hypothetically progress from that … state to a permanently damaged state.…

….

… In my opinion, [UPMC's] actions actually did not end up harming [Appellant] because I believe the stroke was already completed when he was at Bedford.

*Id.* at 211-12 (emphasis added).

However, Dr. Gebel testified regarding the symptoms experienced by

Appellant following his discharge from UPMC Bedford:

[UPMC's Counsel:] So, Doctor, when we're talking about one stroke being completed and then another event occurring the night after UPMC Bedford[,] is there something about the anatomy in our brains and how they receive blood that you can explain to this jury to help us understand how that even happens?

[Dr. Gebel:] Sure. So basically as blood flow gets reduced to the brain, and it gets less oxygen and less nutrients. … The nerve cells in the brain. They literally generate electrical impulses. I mean our brains and our spinal cord and our nerves, literally they generate electricity. And you might imagine it takes a lot of energy, you know, to do that.

….

So when you progressively have this vasospasm, this squeezing down of the blood vessels, [] you're slowly basically

- 29 -

strangling off blood flow to the brain. It goes through stages again of lack of blood flow. You know, from sort of … enough to keep it functioning normally to enough to not allow it to function but not yet be dead to the point that it becomes irreversibly dead after a certain amount of time.

*Id.* at 219-21.

He continued,

Dr. Futrell I believe testified that simply because [Appellant] improved that means he had salvageable tissue. And she's correct it does mean he had salvageable tissue. But the problem is it wasn't the tissue that was infarcted when he was at UPMC Bedford that was salvageable[,] it was all the rest of that side of the brain. So she is in my opinion inappropriately conflating that improvement to indicate, you know, that therefore automatically he could have had salvageable tissue at UPMC Bedford when the imaging tell[s] us that it's plain and simply not the case.

[UPMC's Counsel]: And that other tissue that Dr. Futrell talked about that's a tissue that starts to be impacted the night after his discharge and explains why he was having the new symptoms?

[Dr. Gebel]: Exactly. That explains his wandering around the house naked. Missing, you know, the [pitcher] of water when you try to pour it in the glass. Pouring it all over the counter. And, you know, why he was having all these other dramatic, you know, alarming symptoms we talked about.

*Id.* at 226-27.

On cross-examination, Appellant's counsel asked Dr. Gebel, "you're not saying there were two strokes[,] are you?" *Id.* at 256. The following testimony then occurred:

[Dr. Gebel:] No. Because the second stroke was aborted, prevented from happening by [UPMS Presbyterian's] intra-arterial Verapamil.

….

- 30 -

**So there's only one actual stroke. One event that caused permanent damage that began the evening of the 15th and was completed by later in the day on the 16th, when he got to [UPMC] Bedford.**

[UPMC's Counsel:] … I think I understand your testimony. And we'll get into it a little bit more in detail in a little bit**. But I think what you're saying to our jurors is this was a vasospasm event; correct?**

[Dr. Gebel:] **Yes.**

Q. **And we had an evolving event; correct**? **That's what a vasospasm is? It's a low flow stroke; correct?**

A. **Correct.** But again, two kind of I think distinct events here within that context of "of elusion." **You know we clearly had one event on the 15th, a second event on the 16th.**

…

But the same underlying cause, though.

Q. … [J]ust so I'm clear about it. So, the right middle cerebral artery which is the artery we're talking about, … [s]o it begins to narrow; correct?

A. Yes.

Q. And that –

A. And the [carotid] artery also, they said both.

Q. Right. And that's the process. It's an on-going process. It doesn't stop and then start again; correct?

A. Correct. I mean it can fluctuate. But, yes, it's an ongoing process exactly.

….

Q. … And so we have an evolving stroke on … where some of the tissue may or may not be salvageable, and some is already dead. … [T]hat's your opinion, correct?

A. That's my opinion, yes, sir.

*Id.* at 256-58 (emphasis added). Thus, while Dr. Gebel testified that there was a completed stroke, he described for the first time a separate event taking place following Appellant's discharge from UPMC Bedford.

At the close of UPMC's evidence, Appellant sought to present Dr. Futrell's testimony to rebut Dr. Gebel's claim of a second event. N.T., 11/17/23, at 21. Appellant's counsel proffered,

> Dr. Gebel introduced a new theory to this case. **He indicated there were essentially two strokes.** One stroke that started on the night of the 15th and was completed by the afternoon of the 16th. Interestingly, before [Appellant] gets to [UPMC Bedford]. And then started up again afterwards. That's a new theory. Dr. Futrell is going to talk about that. It will be quick….

*Id.* (emphasis added).

> UPMC disputed Appellant's characterization of Dr. Gebel's opinion:
>
> [UPMC's Counsel:] That is not a new theory. That was set forth in Dr. Gebel's report. … [Appellant's counsel] had an opportunity to rebut that, and call Dr. Futrell. Specifically, … [Dr. Futrell] testified about portions of [Dr. Gebel's] report. And I think she even addressed this exact issue when we looked at the CT[] and MRI images and told the jury that: No. There's no evidence that a … stroke was complete. This exercise has been done. This is nothing more than repetitive testimony that [Appellant's counsel] had an opportunity to put on in his case in chief. And I think he did.

*Id.* at 22.

Relevantly, the trial court discussed the proposed rebuttal testimony with Appellant's counsel:

[The Trial Court:] [Dr. Futrell's] testimony already is I mean she took the jury through the CT scan and gave her testimony as to why she believed it to be an evolving stroke. So how, how is that going to be any different?

[Appellant's Counsel]: She's going to testify that this was not a completed stroke….

THE COURT: But she already said that.

[Appellant's Counsel:] … [S]he's going to say it was not a completed event.

….

[Appellant's Counsel:] And that … this was one event that continued through the evening of the 16th….

THE COURT: She's already said that.

[Appellant's Counsel]: But, Your Honor, they have to introduce yet a new theory. They've introduced a new–

THE COURT: If the testimony before this jury [] from Dr. Gebel [is] that it was a completed stroke. And then the testimony from all the other experts in the case, **even Dr. Gebel,** is that something else had occurred in the brain afterwards then, too.

[Appellant's Counsel]: Correct.

THE COURT: … So, I think the jury clearly understands that something else occurred. Your witnesses already testified that it was a completed stroke. You had her comment on Dr. Gebel's rebuttal.

My problem with allowing the rebuttal testimony is [] because I think the rebuttal testimony is anything other than just having the … last word in the case. Because when your experts testified over the defense objection, I allowed them to comment on anything in the defense expert's reports before they testified. … So over their objection.

Then when we got to the defense experts, there were many objections that the defense experts had to only testify from what

- 33 -

the four corners of their reports and their opinions, and [the court] granted a lot of those.

     … **[S]o, a lot of what was outside of those reports was actually brought in on cross.** … So, I don't think that anything that you just told me that Dr. Futrell said she hasn't already said. And I think the jury clearly understands, because I clearly understand the differences between their testimonies. And I don't think having her say it, again, does anything good to the jury other than extending the trial and just having her on the stand last.

*Id.* at 24-27 (emphasis added). Although Appellant claimed that Dr. Gebel had presented a new theory, the trial court found Dr. Futrell's rebuttal would be cumulative of her prior testimony. ***See id.***

Upon review, we disagree with the trial court's assessment that Dr. Futrell's proposed rebuttal would be cumulative to her prior testimony. The parties, through their experts, vigorously disputed the issue of causation. At trial, Dr. Gebel testified about a new "event" following Appellant's discharge from UPMC Bedford. This "new event" was raised for the first time during Dr. Gebel's testimony. Under these circumstances, we conclude Dr. Futrell's proffered testimony was not cumulative; rebuttal should have been allowed as a matter of right. ***See Ratti***, 758 A.2d at 709 ("where the evidence proposed goes to the impeachment of his opponent's witness, it is admissible as a matter of right." (citation omitted)). We thus conclude the trial court erred in disallowing Dr. Futrell's rebuttal testimony. Consequently, we vacate the trial court's judgment and remand for a new trial.

Judgment vacated. Case remanded for a new trial consistent with this memorandum. Jurisdiction relinquished.

Judge Kunselman joins the memorandum.

Judge Bowes joins the memorandum and files a concurring statement.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 04/25/2024